569 So.2d 466 (1990)
Maria CASO, Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 89-677.
District Court of Appeal of Florida, Third District.
September 11, 1990.
Rehearing Denied November 29, 1990.
*467 Greene and Greene, Robin Greene and E. Joseph Ryan, Jr., Miami, for appellant.
Blackwell, Walker, Fascell & Hoehl and David M. Rogero, Miami, for appellee.
Thomas W. Logue, Miami, for guardian ad litem.
Before SCHWARTZ, C.J., and HUBBART and NESBITT, JJ.
NESBITT, Judge.
Appellant seeks review of a final judgment entered on January 26, 1989 granting the Department of Health and Rehabilitative Services' (HRS) petition for termination of parental rights to her ten-year-old son, S.R.S., and permanently committing him to HRS for adoption. We affirm upon a finding that the agency has shown by clear and convincing evidence neglect of the child justifying termination of parental rights.
In November 1985, appellant was reported to HRS for failing to take S.R.S. to the hospital until two days after he had been hit by a car. Thereafter, the trial court adjudicated S.R.S. a dependent and ordered him into the temporary custody of HRS. S.R.S. presently resides in a licensed foster home.
The trial court found that appellant had neglected her son by failing to obtain prompt medical attention when it was in the child's best interest to do so, by failing to properly administer medication to the boy, and by failing to maintain control and supervision over the child's behavior. That court also found that appellant and her attorney had entered into a performance agreement for the purpose of appellant receiving training in parenting skills, but that after only nine days appellant voluntarily left the parenting program. Thus, she failed to make her best effort to learn these necessary skills. Furthermore, the trial court found appellant's failure to comply with the agreement was not the result of conditions beyond her control.
Absent clear error, it is not the function of this court to re-weigh the evidence and substitute our judgment for that of the trial court. The trial court's findings of fact should not be disturbed absent a total lack of substantial evidence in its support. In Interest of R.D.D., 518 So.2d 412 (Fla. 2d DCA 1988); see Greenwood v. Oates, 251 So.2d 665 (Fla. 1971).
Section 39.01(37), Florida Statutes (1989) states:
(37) "Neglect" occurs when the parent or legal custodian of a child ... deprives *468 a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment or permits a child to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.
As indicated by the statute, both past and prospective neglect are to be considered when determining whether termination of parental rights is appropriate. Palmer v. Department of Health & Rehabilitative Services, 547 So.2d 981, 983 (Fla. 5th DCA), cause dismissed, 553 So.2d 1166 (Fla. 1989). See In Interest of J.J.C., 498 So.2d 604 (Fla. 2d DCA 1986) (court recognized the concept of prospective neglect as a basis to terminate parental rights where a mother was found to be a chronic schizophrenic and her condition was basically untreatable rendering her incapable of effectively rearing a child). See also In Interest of R.D.D., 518 So.2d at 412 (where grandmother who was primarily responsible for autistic and underdeveloped child had not followed up on special programs for child and would not follow instructions about the child's medication, court affirmed trial court's determination that the child had special needs and the home environment put the child in danger of significant impairment amounting to neglect under the statute); In Interest of J.B.H., 491 So.2d 1226 (Fla. 4th DCA 1986) (judgment of permanent commitment of minor children for subsequent adoption was in best interests of children where natural mother was danger to herself and to others, having been physically abused as child and being totally incapable of providing care to children, and where children had been placed in numerous foster homes during previous four years); In Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982) (because of clear and convincing evidence that neglect and abuse would occur if the child was placed in the care of his mother, commitment for subsequent adoption was held proper).
While the technical breach of a performance agreement cannot alone justify termination of parental rights, the trial court may consider evidence of a parent's failure to comply with an agreement in conjunction with evidence of neglect. In Interest of J.L.C., 501 So.2d 92 (Fla. 1st DCA 1987). Also, a willful failure to complete the counseling necessary to develop parenting skills can rise to the level of neglect. Lett v. Department of Health and Rehab. Servs., 547 So.2d 328 (Fla. 5th DCA 1989). A parent's psychiatric history is relevant where the state makes an explicit connection between the parent's past behavior and a potential significant impairment of a child's physical, mental, or emotional health. I.T. v. State, Dept. of Health & Rehabilitative Services, 532 So.2d 1085, 1088 (Fla. 3d DCA 1988).
Parental rights are subject to the overriding principle that it is the ultimate welfare and best interest of the child which must prevail. In Interest of J.A., 561 So.2d 356 (Fla. 3d DCA 1990); In Interest of M.J., 543 So.2d 1323, 1324 (Fla. 4th DCA 1989); In Interest of Baby Boy A, 544 So.2d 1136, 1137 (Fla. 4th DCA 1989). See also In Interest of J.L.P., 416 So.2d at 1252; § 39.001(2)(b), Fla. Stat. (1989) (purpose of chapter 39 includes "[t]o assure to all children ... the care ... which will best serve the ... welfare of the child... .").
At trial, Dr. Simon Miranda, a court-appointed psychologist, testified concerning S.R.S.'s mental status. His examination of the boy revealed that S.R.S. was in acute distress, emotionally underdeveloped, primitive, unstable, and not properly organized. The boy's condition causes his view of the world to be incomplete and fragmentary. At the time of the examination, while his chronological age was seven years, nine months, S.R.S.'s mental age was only four years, nine months. His I.Q., 58, indicated moderate mental defectiveness. He exhibited disorganized thinking typical of emotionally disturbed children, suppressed anger, and disruptive impulses. He had abnormally weak bonds to his mother and was ambivalent about returning to her. Dr. Miranda concluded that the child was sufficiently disturbed to require a therapeutic setting, and that the child needed an *469 orderly, stable environment in order to achieve emotional security.
Dr. Miranda, also testified concerning appellant's mental state, her emotional condition, and her parenting abilities. The doctor diagnosed the appellant as being in the upper end of the mentally retarded range of intelligence, rebellious, and unable to relate to authority. Based upon his 1986 psychological testing of the appellant, Dr. Miranda determined that she was markedly disturbed and in need of treatment; she needed screening for possible substance or alcohol abuse; she exhibited signs indicating that she might be suffering from a mixed personality disorder; she demonstrated poor judgment and impulsive tendencies. He further concluded that her history of mental illness would impair her future capacity to function effectively as a caretaker and that she was not capable at that time of meeting S.R.S.'s educational needs. Dr. Miranda predicted that appellant probably would not reach a point where she could be a caretaker for S.R.S., with neglect being the greatest potential problem.
The doctor's re-examination of appellant in January 1987 revealed that while her scores on certain scales indicating abusive tendencies had dropped and were no longer deviant, her overall emotional state had deteriorated. Her psychotic and alcohol abuse scale scores were elevated. She exhibited signs of clinical paranoia. The doctor diagnosed appellant as suffering from a disordered and dysfunctioning personality and concluded that appellant was unable to care for herself much less "for young children and particularly children with special needs." The doctor concluded that visitations between the appellant and S.R.S. should be curtailed because of "the environment she created around the children [S.R.S. and his sister] which I considered harmful." He warned that appellant was communicating her psychosis to the child and that rather than being helpful to S.R.S.'s special problems, appellant "would tend to reinforce [his] aggressive tendencies and lack of confidence." For this reason, the doctor concluded that contact between appellant and S.R.S. should "be terminated for the sake of giving the children an opportunity to go on with their lives in a suitable environment."
Marian Rossman, the guardian ad litem for S.R.S. testified that appellant was unable to control the child. Also, according to Rossman, she observed little emotional interaction between appellant and her son during controlled visitations. The guardian advocated the termination of parental rights. She testified that as part of a modified performance agreement appellant had been enrolled in Project Support, a residential treatment program for disturbed mothers and their children. After only nine days at the Project, appellant left, refusing to follow the Project's rules. At Project Support, appellant had shared her prescription medications with other patients and she was confused about what medications she was actually taking. She was unable to perform the simple skill-teaching tasks required by the program, such as preparing lunch for her children during a visitation period. The director of Project Support had concluded that appellant exhibited a willful failure to fulfill even minimal parenting tasks.
The guardian stated that since S.R.S. was declared dependent and placed in foster care, the child has been steadily improving. He has become self-sufficient in terms of dressing and feeding himself. He attends an Easter Seals school designed for special children. His coordination has improved. He is beginning to participate in athletic programs at school and he has a number of friends. Also, he has stopped running away, which was previously a grave problem. She concluded that "considering his disability, [he] is doing fantastically in every area."
Carol Clifford, an HRS counselor, testified that appellant admitted giving S.R.S. psychotropic medication which had been prescribed by her own physician. The counselor testified that she had observed the appellant and her son during scheduled visitations and appellant's behavior was distant and erratic. Both the HRS social worker and S.R.S.'s guardian agreed "the children [S.R.S. and his sister] are apprehensive *470 and fearful of their mother. Visitation appears detrimental to the children's emotional stability."
Appellant's own therapists, Anne Nicol, M.D., Steve Barsky, L.C.S.W., and Benjamin Brauzer, M.D., concluded that, after two years of therapy, "The improvement [in appellant] appears so slight it would seem extremely unlikely that she could function as a parent. It does not seem realistic to expect that type of functioning at a further date either." These authorities reported that while appellant was motivated to be with her children, "her judgment and reasoning abilities seemed so impaired, that proper care for her children seems highly improbable." Dr. Emerson, an examining psychiatrist, concurred that it was unlikely appellant "could completely take care of her child."
Appellant testified on her own behalf. She admitted to having a history of mental and emotional problems. She also admitted that she has been taking antidepressant and antipsychotic medication since 1985, when she went to Jackson Clinic pursuant to her initial performance agreement with HRS. Appellant did little to refute the overwhelming evidence of neglect. She admitted leaving her child in the care of highly questionable baby-sitters. One such baby-sitter was a 95-year-old neighbor with hearing problems. When asked about this sitter's qualifications, appellant responded "I don't know if he's got mental problems or not." At trial, upon examination, this man did not recognize the boy's name nor was he sure where in the apartment complex appellant and S.R.S. lived. Appellant described a second baby-sitter as "... my enemy... . She was manipulative. She was an alcoholic. The HRS has taken her kids away from her. She beat my son... ." Appellant admitted her son had escaped her supervision on several occasions. In fact, on at least five separate occasions appellant had filed missing persons reports when she had no idea of the young boy's whereabouts. She admitted seeing her son hit by an automobile and ignoring the advice of police at the scene that she get her son immediate medical attention. She admitted leaving the parenting skills program, Project Support, because she felt restricted by its rules and because under its strictures she could not visit friends with whom she wished to spend time. Appellant claimed a recent marked improvement in her mental and emotional health; however, no medical or professional testimony was submitted to support this claim.
A careful review of the evidence presented shows that S.R.S. has progressed in the environment established by HRS. It is not in his best interest to remain in foster care or to be returned to a harmful home environment where the interplay between mother and child increases the child's emotional problems and the risk of future neglect remains great. In Interest of R.D.D., 518 So.2d at 412; In Interest of J.B.H., 491 So.2d at 1226; In Interest of J.L.P., 416 So.2d at 1250. Permanent commitment for adoptive placement was advocated by HRS and the guardian ad litem for S.R.S. "because of her [the mother's] impulsively (sic) poor judgment, and inability to delay gratification; these limitations severely impair her ability to provide for her children adequately. The children are at risk while in her care." The experts and caseworkers all recommend the continued separation of S.R.S. from appellant. They agree that removal of the boy from his current school program would be detrimental. See R.D.D., 518 So.2d at 415.
S.R.S. is a child of special needs requiring maximum parenting skills and appellant has demonstrated much less than average skills. No reasonable person would argue that the continuation of a parent-child relationship in this particular case serves or promotes the child's welfare. This confused and disoriented mother who is unwilling to relegate her own personal pursuits to the best interests of her child will only intrude on the child's continued improvement, making the life of the child unbearably complicated, and direction, control, and loving management by the necessary foster parents even more difficult than it already is with this impaired child.
Fortunately, the societal values reflected in our legislation no longer relegate a child *471 to the status of a chattel under arcane property law where a biological parent is free to claim possession of the child when the parent feels ready, no matter what the consequences to the child's well-being. In the instant case, the dependent child has a compelling need and, consequently, a corollary right to be developed and nurtured so that he might hopefully mature into a useful citizen without appellant's deleterious and intrusive conduct. Since the removal of the child from the environment provided by appellant, the child has progressed in every area: he no longer runs away, he gets along with people, he has gained some self-sufficiency.
In sum, HRS proved a strong and compelling case that Mrs. Caso had deprived S.R.S. of a physically and emotionally safe environment. She thereby endangered his emotional health causing him to be significantly impaired even beyond his own limitations, this damage occurring in the past and appearing certain to occur in the future. The trial judge's findings and order comports entirely with the legislative mandate with respect to termination of parental rights. One of the purposes for termination of parental rights is to enhance the adoption of a neglected child. S.R.S.'s chances of adoption have been reduced, in part due to the neglect of his biological mother; however, even though no suitable adoptive parents presently want S.R.S. for a child of their own, because of the perversity and chronicity of the neglect of the mother toward S.R.S., the child is still vastly better off without the periodic confusion that must be occasioned when his natural mother injects herself into his life.
Two additional points raised by appellant do not change this conclusion. First, appellant claims that HRS did not comply with the trial court's February 26, 1987 order requiring HRS to initiate termination proceedings within thirty days. Also, she points to HRS's failure to initiate termination proceedings within the statutory three-month period from the date of the previous judicial review hearing as outlined in section 39.454, Florida Statutes (1989). She claims that the case should have been dismissed because of HRS's failure to move forward within the prescribed times. We disagree. All delays in this case were due at all times, at least partially, to appellant's own ambivalence as to whether she should voluntarily terminate her parental rights. Appellant, on more than one occasion during this period, was negotiating this voluntarily termination with HRS. At one point, appellant signed notarized affidavits voluntarily terminating her parental rights. However, she subsequently withdrew these affidavits.
Second, section 39.467(6), Florida Statutes (1989) requires the judge to enter a written order with findings of fact and conclusions of law. We find no error in the trial court assigning counsel to prepare a suggested order. From this proposed order, the judge prepared the final order of termination.
Accordingly, the trial court's order terminating appellant's parental rights is affirmed.
HUBBART, J., concurs.
SCHWARTZ, Chief Judge (dissenting).
The court's opinion conclusively demonstrates in agonizing detail that S.R.S. would have been far better off with a mother different from the thoroughly flawed and seriously ill woman who gave him birth. Such a concept, however, is not only philosophically and biologically impossible, it does not embrace the rule which must be applied to the profoundly important issue in this case. In my view, while the court essentially bases its determination on the undeniable, but impertinent, conclusions that the appellant is not a good mother and that S.R.S.'s "best interests" accordingly lie without her (even though this means he will have no mother at all but the HRS), the majority fails to demonstrate that the appellant has forfeited her parental interests under the statutory law of Florida  which, I will permit myself to say, is reflective of the law of nature which binds parents and their children. My views in this regard are summarized and far better expressed in a series of opinions on this *472 issue by Judge Cowart. See Lett v. Department of Health & Rehabilitative Servs., 547 So.2d 328, 330 (Fla. 5th DCA 1989) (Cowart, J., dissenting); Manuel v. Department of Health & Rehabilitative Servs., 537 So.2d 1022, 1024 (Fla. 5th DCA 1988) (Cowart, J., dissenting); Gunter v. Department of Health & Rehabilitative Servs., 531 So.2d 345, 345 (Fla. 5th DCA 1988) (Cowart, J., dissenting); Fredrick v. Department of Health & Rehabilitative Servs., 523 So.2d 1164, 1167 (Fla. 5th DCA 1988) (Cowart, J., dissenting), review denied, 531 So.2d 1353 (Fla. 1988). Although these opinions are dissenting ones, they should not be. Applying them, I would reverse the judgment below.