YATES, Judge.
This case involves the custody of twin girls, A.B. and T.B. (“the twins”), born in 1994, and their younger sister, F.M.A., born in 1997.
On October 10, 1995, J.L.H.; C.H.; and M.D.B.A. (“the mother)” jointly petitioned the juvenile court for a change of custody of the twins from the mother and the father (F.O.O.) to J.L.H. and C.H. The petition stated that J.L.H. and C.H. were friends of the mother; that they had had physical custody of the twins since May 1995; and that the mother and father were unable to properly care for the twins. The petitioners asked the court to set “reasonable visitation” for the mother and moved the court to allow service of the petition on the father by publication. The court ordered service by publication. The father did not answer, and the court entered a default judgment in June 1996, awarding legal and physical custody of the twins to J.L.H. and C.H., and allowing the mother reasonable visitation.
Subsequently, J.L.H., C.H., and the mother entered into an agreement for a modification of custody of the twins. The court, on April 8, 1998, adopted that agreement as its order, stating that those three parties would share joint legal custody of the twins, with the mother being awarded primary physical custody, subject to scheduled visitation by J.L.H. and C.H. The court further ordered that J.L.H. and C.H. would regain full custody of the twins if the mother: (1) “is found guilty and is incarcerated for any conviction of any criminal offense which was committed prior to the date of the entry of the Court’s Order in this case”; (2) “is found guilty and incarcerated for any felony committed after the date of the entry of the Court’s Order in this case”; or (3) “becomes deceased within two (2) years of the date of the entry of the Court’s Order in this case.”
On June 8, 1998, J.L.H. and C.H. petitioned the court to terminate the parental rights of the mother and father as to the twins, and to award them permanent custody of the twins. The next day, the children’s maternal grandmother, C.B., and her live-in boyfriend, D.S., petitioned to intervene in the case, seeking custody or visitation rights as to the twins.
Also on June 8, 1998, M.A. and M.A., the paternal grandparents of F.M.A., whose father is A.A., petitioned the court for custody of F.M.A., alleging that she was dependent and in need of protection, because, they said, the mother had provided unstable and poor living conditions and the child’s welfare and safety were endangered. M.A. and M.A. moved the court to consolidate the two cases; the court granted their motion.
The court held an emergency hearing in July 1998, and, in a pendente lite order, awarded temporary custody of the twins to J.L.H. and C.H. and awarded temporary custody of F.M.A. to M.A. and M.A., with *251 visitation to the mother. The court appointed two juvenile advocates to represent the best interests of the children. The advocates submitted to the court a detailed report regarding visits and interviews they had conducted with all involved parties, as well as with the children’s physician, neighbors of the mother, and others. Carolyn Nixon, a juvenile-court “dependency investigator,” conducted home evaluations of M.A. and M.A., C.B., the mother, and J.L.H. and C.H. Nixon recommended that custody of the twins be placed with J.L.H. and C.H., and that custody of F.M.A. be placed with M.A. and M.A.
The court held a final hearing, at which considerable evidence was presented and numerous witnesses testified as to what they perceived to be the best custodial arrangement for the three children. Following these proceedings, the court, on August 7, 1998, issued a detailed eight-page order, awarding sole legal and physical custody of the twins to J.L.H. and C.H., and awarding sole legal and physical custody of F.M.A. to M.A. and M.A. The order stated, in pertinent part:
“Evidence shows that: the mother continues to abuse alcohol although she denies that she is an alcoholic; that she has left her children alone and unsupervised on several occasions; and that she lives in a studio apartment with inadequate sleeping arrangement for the number of children involved. The evidence further shows that the mother has no transportation of her own, that she borrows her mother’s vehicle from time to time, but such vehicle has only two seats, which is inadequate for transporting more than one child at a time. The evidence shows that the mother currently receives Medicaid, subsidized day care, public assistance and foodstamps for the care of herself and her children while in her custody.
“The testimony presented also revealed that the mother married [A.A.] [in early] 1998. They have a child, [F.M.A.], that is also the subject of this Court’s inquiry. [A.A.] is currently serving a term of imprisonment for kidnapping. ...
“At the time of the pendente lite hearing, the Court heard very disturbing testimony concerning [A.A.’s] conduct and the conduct of the mother in connection with his actions. Apparently, on one occasion, a female friend of the mother was found by police inside a vehicle, nude, and complaining that she had been abducted by [A.A.] and [the mother] (then unmarried), that she had been forced to commit sexual acts with [A.A.] and [the mother], and that she had been left by them in that condition. Apparently, due to her former friendship with the mother, she did not file any formal charges against either [A.A.] or [the mother].
“Further testimony from [Investigator] Harry Renfroe revealed that [A.A.] was charged with and later convicted of Kidnapping 1st, involving another but unknown female. Statements were given by both [A.A.] and [the mother] concerning these events. From those statements, it appears that [A.A.] and [the mother] were living at the home of his parents, [M.A. and M.A.]. [A.A.] had acquired some cocaine and alcohol and both he and [the mother] ingested same. He began driving around the Madison County area, ‘looking for a female’ ... whom he and [the mother] would persuade/force to have sex. He drove to a retail store, left [the mother] in the vehicle, and went into the store in quest of a female for those purposes. He found a young woman, followed her to her car and attempted to force her to leave in her vehicle and follow [the mother], who would be driving his vehicle to an undisclosed location for forcible sex. His attempt was thwarted and both he and [the mother] were arrested.
[[Image here]]
“The testimony from [J.L.H. and C.H.] revealed that they were of the *252 impression that the mother was still residing in the home of [M.A. and M.A.] when they agreed to the joint custody arrangement. In fact, [the mother] did not continue to live with [M.A. and M.A.], but had moved to the studio apartment, her current address, when the transfer of primary custody took place. It was while [the mother] was living with all the children in the current residence that ... the mother’s sister recounted that she had witnessed the mother either intoxicated or under the influence of intoxicants on several occasions. [The mother’s sister] was so concerned, on one occasion, that she removed the children and took [F.M.A.] to the home of [M.A. and M.A.].... [The mother’s sister] testified that [the maternal grandmother] had second thoughts about [the mother’s] sobriety and ability to care for the children on that occasion [and] asked [the sister] to go and get the children. No explanation was given as to why [the maternal grandmother] did not confront [the mother] directly with her concerns.
[[Image here]]
“The testimony demonstrates that [the mother] has not adjusted her lifestyle to be a fit and proper parent to any of her children. She [had] not sought proper housing for the children in preparation for the final hearing but explained that if she had the children returned to her she would begin to look. She has not sought more substantial or more convenient employment nor attempted to find other resources than her current minimum-wage, second-shift job. She continues to rely on public assistance, foodstamps and medical coverage for her children through Medicaid. She has failed to file for child support from the natural father of the twins and offers no explanation for turning down the generous offer of [M.A. and M.A.] to live in a home on their property where adequate provisions would be made for the children. Her response to that offer has been that she ‘just wanted to be on her own.’
[[Image here]]
“Based on these specific findings, and the other evidence supported by the record, the Court finds by clear and convincing evidence that [the mother] is and remains to be unfit to care for these minor children. The Court further finds that she is unwilling or unable to properly parent these minor children and that they are dependent children, and must have proper placement.
“In that regard, the Court must now consider what custodial placement is in the best interest for each of these minor children. Several persons have come forward seeking the custody of the minor children, in addition to [J.L.H. and C.H.] who have a joint custodial right to the twins by prior order and agreement. Upon a review of the best interest of each child, the Court makes further findings based on clear and convincing evidence.
“Coming forward requesting custody of the minor children is the maternal grandmother, [C.B.], hereinafter referred to as the maternal grandmother, or [C.B.]. She asserts that she is common-law married to [D.S.], but the Court finds that there is no divorce decree nor testimony that meets the clear and convincing burden to demonstrate that [C.B.] is legally divorced from her first husband, [D.B.]. To the contrary, [C.B.] testified that she remembered that she had signed ‘some papers’ several years ago, but never received a decree signed by any judge nor were copies of such papers offered in support of same.... Without a decree supporting same, the Court finds that there has been no valid common-law marriage to come into existence with [D.S.].
“Nonetheless, the maternal grandmother wishes to be considered on her own, should the Court find her daughter, [the mother], to be unfit. On close examination, [C.B.], without the stability of *253 [D.S.], appears financially unable to support the children. On cross-examination, the mother testified that she voluntarily allowed the twins to live with [J.L.H. and C.H.] because she did not think that her own mother was able to provide care due to the alcohol problem that [C.B.] was then experiencing. [The mother’s] testimony at the hearings is in conflict in that she voluntarily entered into agreements with [J.L.H. and C.H.] to allow them to have full custody under the three provisions cited above, and did not choose to let her own mother have custody; yet she now says that if she cannot have custody, she wants her mother, [C.B.] to have them custody.
“It appears to the Court that the main objection to placement of the twins with [J.L.H. and C.H.] is that they have obtained employment out of the state and that they are not blood-related to the twins. The connection that these children have to [J.L.H. and C.H.] began as a direct choice of the mother. Based on that choice, the twins have lived the majority of their lives with [J.L.H. and C.H.]. It is unquestioned that the children have bonded to [J.L.H. and C.H.]. The twins refer to them as ‘Mother’ and ‘Daddy.’ The Court cannot ignore ... this relationship merely because [J.L.H. and C.H.] have taken new jobs that require them to move out of the state. While it is unfortunate that the mother’s contact with the children will be inconvenienced by such a move, the Court cannot disregard the best interest of the twins and disrupt their lives further by finding a less appropriate placement just because it will be easier for the mother to visit.
“As for [F.M.A.], she has lived the majority of her life in the home with [M.A. and M.A.], It appears that she has adjusted very well to her life in [their] home. She has received excellent care from [M.A. and M.A.] and has bonded to them. The Court further finds that it is in [F.M.A.’s] best interest that she be placed in the primary custody of [M.A. and M.A.].”
The court did not terminate the parental rights of the mother and father as to the twins, but did, however, award “sole legal and physical custody” of the twins to J.L.H. and C.H., setting out a liberal and detained visitation schedule for the mother with the twins. The court ordered, for visitation purposes, that J.L.H. and C.H. transport the twins to Madison County at least once every three months. The court awarded “sole legal and physical custody” of F.M.A. to M.A. and M.A., setting liberal scheduled visitation for the mother and maternal grandmother with F.M.A. Further, the court ordered J.L.H. and C.H., and M.A. and M.A. to attempt to allow “as much visitation as is possible” among the children, outside the presence of the mother, finding that “it is important for the sisters to visit with one another unimpeded so that they may bond as sisters.” The court reserved the issue of child support, finding that application of the Child Support Guidelines (Rule 32, Ala. R. Jud. Admin.) “at this time would be manifestly unjust or inequitable in this case.”
The mother argues that the court erred: (1) in admitting “certain hearsay statements” and “irrelevant evidence” at the July 1998 emergency hearing; (2) in awarding custody of the twins “to unrelated persons, who are now living outside the State of Alabama”; (3) in its award of visitation to her, because, she says, it is “inadequate”; and (4) in awarding custody of F.M.A. to M.A. and M.A.
At the outset, we note the well-settled rule that matters regarding child custody rest soundly within the discretion of the trial court and that judgments regarding those matters will not be disturbed on appeal absent an abuse of discretion. Watson v. Watson, 634 So.2d 589 (Ala.Civ.App.1994). Further, when evidence is presented ore tenus, the judgment of the trial court based on that evidence is presumed correct and will not be disturbed unless it is so unsupported by the evidence *254 as to be plainly and palpably wrong. S.C.S. v. S.W.S, 707 So.2d 278 (Ala.Civ.App.1997). In S.C.S., this court stated:
“Furthermore, we would note that this court in Wright v. Wright, 602 So.2d 421, 423 (Ala.Civ.App.1992), stated the following well-settled law regarding custody disputes between parents and non-parents:
“ ‘It is well settled that a natural parent has a prima facie right to custody of his or her child as against a nonpar-ent. Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte Mathews, 428 So.2d 58 (Ala.1983). Our courts have supported the presumption in favor of the natural parent, even as against grandparents. Ex parte Woodfin, 596 So.2d 918 (Ala.1992). This presumption recognizes that, as a matter of law, the best interests and welfare of the child are served by maintaining parental custody. Terry, 494 So.2d 628. Under the standard delineated in Terry, the presumption may be overcome only by proof that the natural parent “is guilty of ... misconduct or neglect to a degree rendering that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.” Id at 632.’ ”
S.C.S., 707 So.2d at 279.
First, we find the mother’s argument regarding testimony and evidence allowed at the July 2, 1998, hearing to be without merit. That hearing was a pen-dente lite proceeding to determine if the children were “dependent” and in need of temporary custodial placements. “All relevant and material evidence helpful in determining the need for detention or shelter care may be admitted by the court even though not competent in a hearing on the petition.” § 12-15-60(d), Ala.Code 1975; see also § 12-15-65(h). In addition, the trial court had before it clear and convincing evidence on which to make its final determination; therefore, the court did not err in admitting statements made by Investigator Renfroe and accompanying police reports. See K.W. v. State Dep’t of Human Resources, 656 So.2d 849 (Ala.Civ.App.1995).
Next, we address the mother’s argument that her scheduled visitation with the twins is “inadequate.” This court has consistently held that the primary consideration in setting visitation rights is the best interests and welfare of the child. Speakman v. Speakman, 627 So.2d 963 (Ala.Civ.App.1993). Each child-visitation case should be decided in light of its facts and circumstances. Gilchrist v. Gilchrist, 660 So.2d 1005 (Ala.Civ.App.1995). Based on the specific circumstances of this case, we find no error in the court’s visitation schedule.
Finally, the record supports, by clear and convincing evidence, the court’s finding that the mother is unable to properly care for her three children. This court has consistently held that, once a child is found to be dependent, the primary issue is to determine an appropriate placement that serves the best interest and welfare of that child.
“Once a trial court has found a child to be dependent, § 12-15-71, Ala.Code 1975, authorizes the court to make a number of dispositions, including a transfer to ‘[a] relative or other individual who, after study by the department of human resources, is found by the court to be qualified to receive and care for the child.’ The paramount considerations in such a situation are the welfare and best interests of the child. The relationship of a blood relative is subsidiary to such welfare. Clark v. Holland, 274 Ala. 597, 150 So.2d 702 (1963).”
D.K.G. v. J.H. 627 So.2d 937, 938 (Ala.Civ.App.1993). See also, Markiewicz v. Neese, 628 So.2d 835 (Ala.Civ.App.1993).
Given the weight of the evidence, we conclude that the court could properly determine that legal and physical custody of the twins should be awarded to J.L.H. and C.H. This couple has cared for the twins *255 for the majority of the twins’ lives, and all the evidence indicates that the twins have bonded with this couple and consider them parental figures. Likewise, given the weight of the evidence, we conclude that the court could properly determine that legal and physical custody of F.M.A. should be awarded to M.A. and M.A.
The judgment of the trial court is affirmed.
AFFIRMED.
ROBERTSON, P.J., and MONROE, CRAWLEY, and THOMPSON, JJ., concur.