805 So.2d 10 (2001)
S.D., Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
No. 3D00-3086.
District Court of Appeal of Florida, Third District.
September 26, 2001.
Rehearing Denied January 16, 2002.
*11 Greer Davis Wallace; Virginia Lee Stanley, Miami, for appellant.
Ileana Orta-Rodriguez; Robin H. Greene, for appellee.
Before SCHWARTZ, C.J., and COPE and FLETCHER, JJ.
FLETCHER, Judge.
S.D. [Mother] appeals a final judgment which granted the petition of the Florida Department of Children and Families [DC & F], and terminated S.D.'s parental rights as to L.R. The trial court entered a well thought out final judgment which clearly sets forth the grounds and reasons for this most difficult of decisions.
In affirming we share with the reader the trial court's final judgment:
"There is clear and convincing evidence that:
1.1 The Child was first taken into DC & F custody on or about January 7, 1999 based on allegations that he was born cocaine-exposed and that the Mother had a severe substance abuse problem which interfered with her ability to parent. The Child was detained in shelter by Detention Order entered by this Court on January 9, 1999 and the Child was placed in the home of his Godmother, Charlotta Smith.
1.2 The Child is presently in the custody of his father, [M.R.].[1]
This Court having heard the testimony, observed the witnesses and having reviewed the evidence finds clear and convincing proof that:
2.1 The Child was abused and neglected, and prospectively will be abused and neglected in Miami-Dade County, Florida, by the willful acts of the Mother that have resulted in physical, mental and emotional injury that has caused or is likely to cause the Child's physical, mental or emotional health to be significantly impaired.
a. The Mother has a long-standing chronic substance abuse problem that significantly interferes with her ability to care for the Child and she has placed and prospectively will place the Child at risk of physical, emotional and mental harm. When [L.R.] was born cocaine exposed, the Mother met with Vicky Gray, a social worker at the hospital. Ms. Gray initially informed the Mother that the Child was born cocaine-exposed and the Mother responded with a flat affect. Ms. Gray testified that she provided the Mother with the names and phone numbers of DC & F personnel assigned to the case. Ms. Gray also testified that she discussed possible drug treatment and services with the Mother and that she could have assisted the Mother with receiving those services prior to discharge, however, the Mother had no interest at that time. The Mother left the hospital without providing a contact number where she could be reached or notified.
b. The Child has been neglected and abused by the Mother in that the Child was born cocaine-intoxicated as a result of the Mother's drug use during pregnancy, thereby placing the *12 Child at significant risk of physical, mental and emotional harm. Both the Mother and the Child tested positive for cocaine immediately after the Child's birth and it was reported that the Child was suffering from tremors.
c. The Mother has a substance abuse problem that significantly interferes with her ability to care for the Child in that the Mother knew or should have known of the adverse effect her drug use during pregnancy would have on the Child yet she continued to abuse cocaine during her pregnancy in gross disregard of the physical, mental and emotional health of the Child.
d. The Mother has ten Children and this is the Mother's sixth cocaine-exposed Child. All of the Mother's Children have been involved in the dependency system due to the Mother's drug abuse and failure to protect. The Mother's first Child was born cocaine intoxicated in 1989. The Mother has since given birth to six cocaine exposed or intoxicated babies in 1990, 1992, 1993, 1995, 1997 and the Child in 1999. The Mother's parental rights to several of the siblings of the Child have been terminated and these siblings of the Child have all been adopted or are pending adoption. Several of the Child's siblings have been residing with the Maternal Grandmother. The Mother has never tried to regain custody of any of her other children.
e. The Child is at prospective risk of harm in that the Mother has a long and extensive history with DC & F and with relinquishing all of her parental rights and duties. In spite of the loss of all of her Children, the Mother continues to abuse crack cocaine, fails to seek treatment and places her Children at risk of harm in blatant disregard for her physical and mental health, thereby placing the Child at prospective risk of harm. Ruth Brown, a counselor. with the Substance Abuse Newborn Program ("SANP") testified that the Mother had been referred to SANP at least two different times after the births of her Children and that the Mother could not be located despite repeated attempts by Ms. Brown to locate her. Based on the Mother's history with many cocaine-exposed births, Ms. Brown had attempted to locate the Mother on at least ten different occasions. With respect to [L.R.], Ms. Brown went to the address that the Mother provided to the hospital social worker, and left her business card. The Mother never contacted Ms. Brown. The Mother was not willing to avail herself of the services that DC & F and SANP were willing and able to provide to her.
f. At the time of the TPR [termination of parental rights] trial, the Mother was incarcerated on a conviction for aggravated assault with a deadly weapon. The father of the Child was the victim in that crime. The Mother was subsequently released from prison and was not incarcerated at the time of the dispositional hearing on this case. However, the Mother failed to appear at the dispositional hearing. The Court is also aware that the Mother tested positive for cocaine within weeks of her release from prison and prior to this Court rendering its decision on whether the Mother's rights should be terminated. This conduct by the Mother further evidences the Mother's chronic substances abuse problem and her relinquishment of parental responsibility.
g. Reasonable efforts have been made by DC & F to provide assistance to *13 the Mother, however the Mother refuses to seek help for her drug addiction and blatantly disregards the duties and obligations of parenting Children. The Mother continues to use drugs while pregnant and to place newborn infants at risk of physical and mental harm. Richard Rodriguez and Brenda Boston are DC & F counselors and both attempted to provide services and referrals to the Mother. Mr. Rodriguez went to the hospital after the Child was born cocaine-exposed and the Mother had already left the hospital. Thereafter, Mr. Rodriguez went to the father's home where he located the Mother. This was several months after the Child had been born. At that time, the Mother denied that she was [S.D.] and left the premises. Despite the Mother's deceptive behavior, she later returned and talked to Mr. Rodriguez and Ms. Boston. Mr. Rodriguez referred the Mother to the SANP however, the Mother failed to comply with that referral or to seek drug treatment. During the conversation that Mr. Rodriguez had with the Mother, Mr. Rodriguez offered the Mother a referral for drug treatment, however, the Mother stated that she did not want the referral because she would soon be turning herself into the authorities and would be going to jail.
h. To this date, the Mother is still using drugs and failing to seek out services. The Mother's last referral made by DC & F was to ... SANP on January 21, 1999. However, the Mother failed to keep any of the appointments and SANP reported that they have made repeated, unsuccessful attempts to conduct a home-based substance abuse assessment. The Mother has never completed a drug treatment program in spite of the many referrals provided by DC & F. This evidences the Mother's intention to abandon her parental obligations and places the Child at prospective risk of harm.
i. The Mother's inability to benefit from the services offered to her, evidences her inability to be an adequate Mother to the Child in the foreseeable future and evidences her prospective neglect of the Child if the Child is ever reunited with the Mother.
j. The Mother has not remedied the circumstances that caused this Court to place the Child in DC & F custody to the extent that the Child's well-being and safety would not be endangered if the Court were to place the Child in the Mother's custody. Section 39.01(68), Fla. Stat. (1999).
k. The Child is at risk of harm in that the Mother has a history of engaging in acts of domestic violence. The Mother was the perpetrator in at least one episode of domestic violence that resulted in the Mother being found guilty of aggravated assault with a deadly weapon.
2.2 The Child has been abandoned by the Mother in that while being able, the Mother made no provision for his support and made no meaningful effort to communicate with him since the Child has been taken into custody, which evinces a willful rejection of her parental obligations. The Mother has not only abandoned this Child, but has a history of abandoning all of her Children. The Mother has failed to Mother any of her Children and has failed to have any significant contact with them, thereby evidencing the prospective risk to the Child.
2.3 There are no other custody proceedings pending in any other Court concerning the Child.

*14 2.4 It is in the manifest best interest of the Child that this Court terminate the Mother's parental rights to the Child and, pursuant to Sections 39.806 and 39.811, Fla. Stat. (1999), permanently deprive the Mother of any right that she may have to the Child because:
a. The Mother lacks the ability and disposition to provide the Child with food, clothing, medical care or other remedial care recognized and permitted under state law in lieu of medical care, or other material needs. Section 39.810(2), Fla. Stat. (1999). The Mother has not demonstrated any ability to provide for herself, let alone a Child.
b. The Mother lacks the capacity to care for the Child to the extent that the Child's health and well-being will be endangered upon the Child's placement in the home of the Mother. Section 39.810(3), Fla. Stat. (1999). The Court has considered the totality of circumstances of this case and the Mother's extensive history of drug abuse and abandonment of her Children demonstrate that she is incapable of providing a stable placement for Children.
c. The present mental and physical needs of the Child and future needs of the Child, to the extent that such future needs can be ascertained based upon the present condition of the Child, require termination of the Mother's parental rights and duties. Section 39.810(4), Fla. Stat. (1999).
d. The Child has the ability to form a significant relationship with a parental substitute, and it is likely that the Child will enter into a more stable and permanent family relationship as a result of permanent termination of the Mother's parental rights and duties. Section 39.810(7), Fla. Stat. (1999). The Child is presently placed with the father.
Having found that these facts as stated have been proven by clear and convincing evidence at trial as to the Mother, The Court finds that it is in the manifest best interest of the Child that this Court terminate the Mother's parental rights to the Child and order the Child to remain in the custody of the Father, [M.R.], pending further order of the Court.
The Court FURTHER FINDS that pursuant to Section 39.811(7)(b), Florida Statutes (1999), the Mother is to have no further contact with the Child.
IT IS THEREUPON ORDERED that the above-captioned Child is hereby adjudicated dependent as to the Mother and the parental rights to the Child of the Mother are terminated and the Mother is permanently deprived of any right that she may have to the Child and the Child is ordered to remain in the custody of the Father, [M.R.], pending further order of the Court. In the event the father successfully completes his case plan and obtains complete custody of the Child, he may decide the question of further contact with the Child."
R.134-40.
The above findings of the trial court as to the Mother's addiction and violence are sufficient to form the bases for the termination. See M.A.P. v. Department of Children & Families, 739 So.2d 1287 (Fla. 5th DCA 1999); M.B. v. Department of Children & Families, 739 So.2d 716 (Fla. 5th DCA 1999); In re K.C.C., 750 So.2d 38 (Fla. 2d DCA 1999). *15 The guardian ad litem[2], in her report, recommended that the Mother's parental rights not be terminated, believing that contact between the Mother and the Child would be beneficial to the Child. That may be, but the trial judge had to determine the Child's best interests. The fact that there may be some potential good that might come from denying the termination petition does not compel denial if there is clear and convincing evidence that the Child's best interests lie in granting the petition. This the trial judge found to be the case. Accordingly the final judgment terminating the Mother's parental rights to the Child is affirmed.
Affirmed.
COPE, J., concurs.
SCHWARTZ, Chief Judge (dissenting).
In dissenting, it would be enough to rely upon the report of the guardian ad litem[3] which, in my view, is both factually and legally irrefutable:
COMES NOW, Greer Davis Wallace, court-appointed Guardian Ad Litem, of L.R., the Minor Child, and submits the following as the Guardian Ad Litem's (GAL's) Report and Recommendation on best interests and termination of parental rights, and states as follows:
I. INTRODUCTION
1. This report is guided by the Guardian's concerns as an objective voice of the Child, while cognizant of competing interests of the other parties, i.e., the Department of Children and Families and the Mother.
2. The following information has been considered:
A. The dependency files pertaining to L.R. and his siblings, and the Termination of Parental Rights file on L.R., which included the trial transcripts of the termination proceedings held before Judge Leban.
B. Discussions with each parties' counsel on case issues, resolution options, and their respective client's expressed concerns regarding the minor child;
C. Discussions with the child's Mother, S.D., and Father, M.R., Sr.
D. Discussions with the Maternal grandmother, Betty Dumas and the Paternal grandmother, Connie Robinson.
E. Observation of M.R., Jr. and L.R. with their father, M.R., Sr.
F. Discussion with Ermina Dean, the child's babysitter since March 1999.
G. Review of the criminal history of M.R., Sr., the child's father and consideration of his compliance with his case plan, his prior drug use and his present caretaker status of L.R. and his brother, M.R., Jr.
H. The Mother's criminal history, her history of drug abuse, the extent of her contact with her other children, terminations *16 on four of her children and her recent Surrender of the child, M.R., Jr.
I. The factors delineated in Section 39.810, Florida Statutes (1999).

II. FINDINGS BY THE GAL
After reviewing the above, the GAL finds that the Mother has a long history of using illegal drugs, has given birth to 10 children, 6 of them cocaine exposed, and none of them have been raised by the Mother.
The Mother's parental rights have been terminated to four of her children. Three of the four, J.R. (termination occurred 9/10/92), L.R., II and T.R. (terminations occurred 8/14/95), remain in the custody of the Department of Children and Families in foster care. The fourth child, J.R., II, has been adopted by the Mother's sister, Cynthia; the Mother continues to have a warm, loving relationship with him, as she does with her other children that are being raised by the maternal grandmother.
The Mother has never been physically or verbally abusive to any of her children. However, her continued drug use has rendered her unable to care for them, but she has respected their placements with other family members and has not in any way interfered with the custody rights of her mother or sister, Cynthia. The Mother has no contact with the three children in the custody of the Department.
The Mother's history of using drugs, while pregnant, is outrageous. Fortunately, her cocaine-exposed children have not been adversely affected medically because of her drug use while pregnant. It appears that the mother's drug use has been mostly self-destructive. Her children, for the most part, are well adjusted children with no special needs associated with the Mother's drug use.
On July 22, 1997, the Mother signed surrenders to the child M.R., Jr. He, along with L.R., is in the custody of his father, M.R., Sr. Both M.R. and L.R. are under no contact orders which prohibit visitation with the mother, but both are having sibling visits with the other children being raised by the maternal grandmother and maternal aunt.
The GAL finds that the Mother lacks the ability and disposition to provide the Child with food, clothing, medical care or other remedial care recognized and permitted under state law in lieu of medical care, or other material needs. Section 39.810(2), Fla. Stat. (1999). The Mother is presently incarcerated, has never regularly supported any of her children and has a long history of using drugs.
The GAL also finds that the Mother lacks the capacity to care for the Child to the extent that the Child's health and well-being will be endangered upon the Child's placement in the home of the Mother. The Mother's incarceration make it impossible for her to overcome this factor. Section 39.810(3), Fla. Stat. (1999).
However, the GAL finds that the present mental and physical needs of the Child and future needs of the Child, to the extent that such future needs can be ascertained based upon the present condition of the Child, do not require the termination of the Mother's parental rights and duties. The child needs the love that the Mother is capable of, as demonstrated by her relationship with some of her other children. Section 39.810(4) and (5), Fla. Stat. (1999).
Finally, the GAL finds that though the child has the ability to form a significant *17 relationship with a parental substitute, it is not likely that the Child will enter into a more stable and permanent family relationship as a result of permanent termination of the Mother's parental rights and duties. Section 39.810(7), Fla. Stat. (1999). The Child is with his father who has no intentions of marrying or offering this Child a substitute mother figure and is advocating for a relationship between the Mother and the Child.
The child has been living with his father in a stable, satisfactory environment; this continuity should be maintained. Section 39.810(8), Florida Statutes (1999). There is no need to terminate the mother's parental rights in order to maintain this stability for the child.
The father-son relationship presently existing between the child and his father appears to be strong, healthy and full of love. Section 39.810(9). Termination of the mother's parental rights would not necessarily affect this factor.
Consequently, the GAL finds that it would be best for L.R. to have the opportunity to have at least the same kind of relationship with his mother, as his siblings residing with the maternal grandmother and maternal aunt, rather than have the "void" of a mother figure.
The GAL finds that termination of the mother's parental rights is not in the best interest of L.R. additionally, because there is no plan for him to be placed for adoption. Why terminate if adoption is not the goal and there is a Mother who can offer love and a meaningful relationship?
III. GAL RECOMMENDATIONS
The GAL recommends that it is in the best interests of the minor child, L.R., that his mother retain her parental rights. This finding and recommendation are based primarily on the fact that the mother has a loving, meaningful relationship with some of her other children. These children are being raised by the maternal grandmother, with the exception of J.R., II, who was adopted by the maternal aunt, Cynthia. These children love their mother and look forward to seeing her and spending time with her, even though she does not have custody of them. The Mother has done nothing to interfere with these children's placements and has not harmed them in any way.
On the other hand, though the Mother's parental rights were terminated over four years ago for the three children in the custody of the Department of Children and Families, they have not been placed for adoption, and they have "no mother".
Consequently, the GAL recommends that L.R. remain with his father and that the Mother be given a Case Plan with a goal of continued placement with his father. The Mother should be provided with an opportunity to enter a residential drug treatment program.
Initially, she should be given supervised visitation with L.R., supervision to be provided by her mother, not M.R., Sr. Eventually, after completing a residential program, and regularly testing negative for drugs, the Mother should be given an opportunity to petition the Court for unsupervised visits. The child, however, should never be removed from his father's custody and placed with the Mother, just because the Mother appears to rehabilitate herself.
The guardian's view is in entire conformance with the law of Florida as well expressed in two recent decisions of the Second District Court of Appeal, both of *18 which contain elements similar to this case and each of which reverses the termination of parental rights on facts which are indeed substantially weaker than these. In C.W.W. v. State Dep't of Children & Families, 788 So.2d 1020 (Fla. 2d DCA 2001), the court reversed a termination order as to the mother like S.D. of a "cocaine baby" like L.R. even though, un like this case, the child's parental ties to the father had been properly terminated. The court said:
Natural parents have a fundamental liberty interest in the care, custody, and management of their children. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In the Interest of R.W., 495 So.2d 133, 135 (Fla.1986). Because of this, the Department must prove the allegations supporting the termination of parental rights by clear and convincing evidence and must establish that termination of those rights is the least restrictive means of protecting the child from harm. Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991).
* * *
[T]he Department did not establish that the continuing involvement of the Mother with the child would threaten the child's life, safety, or health irrespective of the provision of services.
* * *
Finally, the Department failed to establish that termination was the least restrictive means of preventing harm to the child. At trial, the Mother did not argue that she should have custody of the child or that the child should not be adjudicated dependent. The Mother admitted that she had problems, and she sought to be given a chance to comply with a case plan that would allow her the opportunity to eventually reunify with the child. The Department did not establish that the child would be harmed by continued custody with her foster family while the Mother worked on a case plan. Therefore, the Department failed to establish that termination was the least restrictive means available to prevent harm to the child.
C.W.W., 788 So.2d at 1023, 1025; see also, e.g., L.L.C. v. Department of Children & Families, 790 So.2d 1239 (Fla. 5th DCA 2001); C.W. v. Department of Children & Families, 789 So.2d 497 (Fla. 5th DCA 2001); F.C. v. State Dep't of Children & Families, 780 So.2d 159 (Fla. 2d DCA 2001); J.A.T. v. State Dep't of Health & Rehabilitative Servs., 590 So.2d 524 (Fla. 2d DCA 1991). In D.W. v. Department of Children & Families, 793 So.2d 39 (Fla. 2d DCA 2001), which reversed an order terminating the mother's parental rights in a situation like this one in which the children remained in the father's custody, even though, unlike this case, the mother had actually physically and mentally abused the children,[4] the court said:
The Department counselor who supervised visitation between the mother and the children testified that the mother had interacted appropriately with them. She stated that the mother's attitude was cooperative and positive, that the mother had completed parenting classes, that she intended to take anger management classes, and that she had stable employment and a stable residence. The guardian ad litem testified that the mother had persevered in taking parenting classes and getting a psychological *19 evaluation in the face of obstacles, such as the lack of transportation. The guardian ad litem did not recommend termination of the mother's parental rights as to the oldest child, D.W., because the child was very attached to his mother. In addition, the mother's family and friends testified that she was a good mother and that they were surprised when they heard the reports of the incident at Wal-Mart. These record facts do not support a finding that the children's health and well-being would be endangered by limited, supervised contact with the mother while the children are in the care and custody of their fathers.
D.W., 793 So.2d at 40. Probably individually, and certainly together, C.W.W. and D.W. require affirmance. Accord M.D.B.A. v. J.L.H., 761 So.2d 249 (Ala.Civ.App.1999)(unfit mother unable to care for minor children because of substance abuse awarded liberal and detailed visitation as opposed to termination of parental rights), cert. denied, 761 So.2d 249 (2000). See generally In re Migdalia M., 6 Conn.App. 194, 203, 504 A.2d 533, 537 (1986)("termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well"), cert. denied, 199 Conn. 809, 508 A.2d 770 (1986); S.P.W. v. Ward, 707 S.W.2d 814 (Mo.App.1986)(termination order reversed where no evidence of harm to children by limited, continuing contact with unfit mother who suffered from emotional and personality disorders); State ex rel. Juvenile Dep't of Multnomah County v. Johnson, 165 Or.App. 147, 997 P.2d 231 (2000)(reversing order terminating rights of parents who suffered from narcissistic personality traits and substance abuse where record consistently demonstrated affection for and interest in children); In re Mary Kathryn T., 427 Pa.Super. 515, 629 A.2d 988 (1993)(reversing order terminating visitation rights of parents who had lost custody of children to placement in foster home due to physical and emotional abuse), appeal denied, 536 Pa. 646, 639 A.2d 32 (1994); State ex rel. C.P., 768 So.2d 134, 144-45 (La.App.2000)("Because the mother and children love each other, and considering the severe and lasting emotional damage to the children that would result from the termination of the mother's parental rights, this is an exceptional case where it would be in the best interest of the children that the mother's parental rights should not be terminated."), vacated on other grounds, 777 So.2d 470 (La.2001); State Dep't of Social Services In re A.D., 628 So.2d 1288 (La.App.1993)(children placed in custody of state with supervised visitation for sexually abusive father where evidence of love and affection between father and his children); Stokes v. Arnold, 27 S.W.3d 516 (Tenn.App.2000)(reversing order granting foster parents' petition to terminate mother's parental rights where mother, who threatened suicide and was previously diagnosed with schizoaffective disorder, exhibited strong bond between herself and children), appeal denied, ___ Tenn. ___, 27 S.W.3d 516 (2000); In re William John R., 200 W.Va. 627, 490 S.E.2d 714 (1997)(children placed in guardianship of Department of Health and Human Resources with supervised visitation for mentally deficient mother where evidence of bond between mother and her children). See generally Annot., Parent's Use of Drugs as Factor in Award of Custody of Children. Visitation Rights, or Termination of Parental Rights, 20 A.L.R. 5th 534 (1994); Odeana R. Neal, Myths and Moms: Images of Women and Termination of Parental Rights, Kan. J.L. & Pub. Pol'y, Fall 1995.
*20 In my view, the decision to the contrary of all of this subverts the interests of both the human beings with whom we are supposed to be concerned. On the one hand, far from a result which least interferes with the mother's "rights" to her child, as the law requires, the court destroys them entirely. On the other, and far more importantly, it likewise destroys the child's right to his own mother's care and companionship. I cannot and will never understand how L.R.'s interests are served by substituting the Department of Children and Families of the State of Florida for and as his own mother. What is more, there is literally nothing to be accomplished by doing so. This is true because, while termination may ordinarily at least permit a subsequent adoption, everyone agreesbecause the father's parental ties remain intact and in the light of the fate of the appellant's other childrenthat adoption is not a viable or realistic possibility for this child.
Thus, all that has happened is to punish the mother for her sadly self-destructive conduct and, more precisely, for her perceived mis conduct in insisting on having children in her situation at all.[5] In the absence of any mistreatment of the child himself, however, this type of child-decision-making by character-assessment is just what we are not permitted to do.[6] See Dinkel v. Dinkel, 322 So.2d 22 (Fla. 1975); Sullivan v. Sullivan, 736 So.2d 103 (Fla. 4th DCA 1999); Bartolotta v. Bartolotta, 687 So.2d 1385 (Fla. 4th DCA 1997), review denied, 697 So.2d 509 (Fla.1987); Jablon v. Jablon, 579 So.2d 902 (Fla. 2d DCA 1991); Culpepper v. Culpepper, 408 So.2d 782 (Fla. 2d DCA 1982); Young v. Hector, 740 So.2d 1153 (Fla. 3d DCA 1998)(Schwartz, C.J., dissenting), review dismissed, 763 So.2d 1046 (Fla.2000); Simms v. State Dep't of Health & Rehabilitative Servs., 641 So.2d 957 (Fla. 3d DCA 1994)(Jorgenson, J., dissenting), review denied, 649 So.2d 870 (Fla.1994); Caso v. Department of Health & Rehabilitative Servs., 569 So.2d 466 (Fla. 3d DCA 1990)(Schwartz, C.J., dissenting); see also Anderson v. Anderson, 736 So.2d 49 (Fla. 5th DCA 1999)(Thompson, J., dissenting); Lett v. Department of Health & Rehabilitative Servs., 547 So.2d 328 (Fla. 5th DCA 1989)(Cowart, J., dissenting); Manuel v. Department of Health & Rehabilitative Servs., 537 So.2d 1022 (Fla. 5th DCA 1988)(Cowart, J., dissenting); Gunter v. Department of Health & Rehabilitative Servs., 531 So.2d 345 (Fla. 5th DCA 1988)(Cowart, J., dissenting); Fredrick v. Department of Health & Rehabilitative Servs., 523 So.2d 1164 (Fla. 5th DCA 1988)(Cowart, J., dissenting), review denied, 531 So.2d 1353 (Fla.1988).
Everyone who actually knows this family including all its membersand almost everyone who knows about it believes that the present result is wrong. The only ones who think it right are a few members of the bureaucracy and three of the judiciary. Because there is no statutory or moral authority to support this decision, well and sincerely motivated though it certainly is, I sincerely protest and respectfully dissent.
NOTES
[1] Termination of the parental rights of one parent and placing the child in the custody of the other natural parent is within the authority of a trial court. In the Interest of A.C., 660 So.2d 330 (Fla. 2d DCA 1995).
[2] Who cannot be praised enough for her excellent pro bono services.
[3] Although we agree about little else in this case, I enthusiastically join in the court's praise of Greer Davis Wallace, the guardian ad litem, who truly anduniquely in my appellate experienceactually represented the interests of her ward, rather than acting as an adjunct of the Department of Children and Families. Compare Simms v. State Dep't of Health & Rehabilitative Servs., 641 So.2d 957 (Fla. 3d DCA 1994), review denied, 649 So.2d 870 (Fla.1994); see also Attorney Ad Litem for D.K. v. Parents of D.K., 780 So.2d 301 (Fla. 4th DCA 2001)(guardian ad litem representing children in resisting psychological evaluation).
[4] None of the "domestic violence" relied upon by the trial court involved abuse by S.D. of any of her children.
[5] Thus, the Department's lawyer argued before us that S.D. did not deserve to be a mother and that she wanted the benefits of parenthood without accepting the responsibilities. I do not think that a state agency should be heard to make an argument like this one.
[6] To do so in this case is particularly tragic and ironic because we exacerbate the consequences of a child being born with so little of his mother by depriving him of her altogether.