532 So.2d 1085 (1988)
In the Interest of I.T., a Child, Appellant,
v.
The STATE of Florida, DEPARTMENT OF HEALTH & REHABILITATIVE SERVICES, Appellee.
No. 87-2082.
District Court of Appeal of Florida, Third District.
August 16, 1988.
On Motion for Rehearing October 11, 1988.
*1086 Virginia Lee Stanley, Barbara Green, Miami, Terence J. Anderson, Coral Gables, for appellant.
Robert A. Butterworth, Atty. Gen., and Joseph Lewis, Jr., Asst. Atty. Gen., for appellee.
S. David Sheffman, Miami Beach, for guardian ad litem.
Before BARKDULL, DANIEL S. PEARSON and JORGENSON, JJ.
JORGENSON, Judge.
The parents of I.T. appeal from an order of the trial court adjudicating their infant son to be dependent. We reverse upon a finding that the state has failed to show by a preponderance of the evidence that I.T. is at risk of prospective neglect.
The Department of Health & Rehabilitative Services (HRS) removed I.T. from his mother and father shortly after I.T.'s birth in November, 1986. HRS thereafter filed an amended petition alleging that the mother and father suffer from emotional or mental conditions which prevent them from properly caring for their child and cause him to be at risk for abuse and neglect. Pursuant to the amended petition, the trial court ordered psychological evaluations of the parents by a court-appointed psychologist and the HRS Child Protection Team. The mother and father cooperated by submitting to interviews and to a battery of psychological tests. Four months after the evaluations were completed, the state filed a motion for disclosure and production of the parents' clinical records for a period of several years preceding the birth of I.T. The state averred that disclosure of the parents' psychiatric histories was necessary in order to inform the trial court of all the facts and circumstances surrounding the case. The parents objected to the disclosure of their clinical histories on the grounds of privilege and irrelevancy. The trial court received memoranda of law and thereafter granted the state's motion. At the hearing on dependency, the trial court, over the parents' objections, also allowed into evidence testimony concerning the circumstances of the death of the mother's first child. Both parents testified at the hearing. In addition, several psychologists and caseworkers testified concerning the parenting abilities of I.T.'s mother and father based upon interviews, test results, and review of the parents' psychiatric records.
The evidence adduced at the hearing shows a family struggling to come to terms with physical and emotional trauma. In 1981, the mother was raped. She did not receive rape therapy, treatment, or counseling, notwithstanding the pregnancy that resulted from the rape. Although she began making arrangements to put the baby up for adoption, the mother went into premature labor and gave birth to the child while seated on a toilet in her bathroom. During labor and delivery, she suffered lapses of consciousness which were later diagnosed as complex partial epileptic seizures. The child had drowned in the toilet by the time paramedics arrived. The mother's ordeal throughout labor and delivery was described by a psychologist at the hearing as "nothing short of horrendous." The mother, however, was charged with negligent homicide as a result of the child's death. She pleaded nolo contendere and was placed on probation.
I.T.'s parents were married in 1982. Their first child, E.M.T., was born microcephalic.[1] Shortly after E.M.T.'s birth, the mother was hospitalized for complex partial seizures. She later attempted suicide and was treated for depression in a state hospital. Upon her release, she was arrested *1087 for probation violation because she had left the county with the father and had failed to pay the costs of supervision. The mother was sentenced to eighteen months' incarceration for the probation violation. During the time the mother was serving her sentence, she and the father released their microcephalic child for adoption. During the same time period, the mother had surgery for breast cancer. The mother's medical problems were compounded by her affliction with Crohn's disease, a chronic inflammation of the bowel, which necessitated an ileostomy after the birth of I.T.I.T.'s father also suffers from seizures and has had minimal brain dysfunction since birth. He has most recently been diagnosed as having attention deficit disorder, residual type. He was hospitalized for psychiatric reasons at the age of eleven and again at the age of nineteen. Since September, 1986, the father's seizures have been controlled with Dilantin. The record indicates that the father attempted suicide in 1985 and again in 1986. The mother testified that the father's suicide attempts resulted from his despondency concerning her incarceration and his inability to secure permission to visit her while she was jailed. He was permitted to see her only once in a year and a half, when she was hospitalized for cancer surgery. The mother observed, "It wasn't brilliant, what he did. But, I understand." Neither parent has been adjudicated incompetent. Since I.T.'s birth, both parents have been permitted limited supervised visitation with I.T.
The results of the psychological testing ordered by the trial court indicate that both parents operate within the average range of intelligence. The mother excels in abstract reasoning skills and social judgment. Neither parent showed psychotic tendencies, nor was there evidence of impaired reality or bizarre thought content. The HRS case workers, psychologists, and psychiatrist agreed that the parents have the potential for impulsive, irresponsible behavior and for loss of control in emotionally charged situations. The consensus was that excessive stress or anxiety might result in "impaired judgment" or "impaired problem solving." In the opinion of the court-appointed psychologist, I.T. would be at risk of neglect but not of abuse if placed in his parents' care. The psychologist based her opinion on the parents' prior histories and on the psychological reports with regard to poor judgment and impulsivity.
At the conclusion of the hearing, the trial court pronounced I.T. dependent because of the risk of neglect. I.T.'s parents appeal from the order of dependency. They charge as error that the order fails to set forth the factual basis for the adjudication; that the evidence adduced at the hearing is insufficient to support a finding of dependency and the underlying petition is insufficient as a matter of law; that the trial court erred in admitting evidence concerning the death of the mother's first child; and that the trial court erred in abrogating the psychotherapist-patient privilege to permit discovery of the parents' psychiatric records. All but the last point have merit.
Chapter 39, Florida Statutes (1985), provides the exclusive means whereby a trial court can declare a child to be dependent. State v. M.T.S., 408 So.2d 662 (Fla. 3d DCA 1981), rev. denied, 419 So.2d 1200 (Fla. 1982). An adjudication of dependency must be based upon a showing of abuse, abandonment, or neglect. Id. Section 39.01(27), Florida Statutes (1985), defines neglect as occurring
when the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person primarily responsible for the child's welfare deprives a child of, or allows a child to be deprived of, necessary food, clothing, shelter, or medical treatment or permits a child to live in an environment when such deprivation or environment causes the child's physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired. (Emphasis supplied.)
Proof of neglect sufficient to establish a state of dependency must be met by a preponderance of the evidence standard. In the Interest of K.H., 527 So.2d 230 (Fla. 1st DCA 1988); In the Interest of L.T., 464 So.2d 201 *1088 (Fla. 5th DCA 1985); § 39.408(2)(b), Fla. Stat. (1985).
Florida law requires that a trial court, in adjudicating a child dependent, "shall enter a written order specifying the facts upon which the finding of dependency is based." § 39.409(3), Fla. Stat. (1985); Fla.R.Juv.P. 8.780(i). The trial court's failure in this case to state the facts upon which its finding of dependency was made, relying instead upon "the reasons set forth in the Petition," is clearly reversible error. In the Interest of C.S., 503 So.2d 417 (Fla. 1st DCA 1987); In the Interest of G.D.H., 498 So.2d 676 (Fla. 1st DCA 1986).
The reasons set forth by HRS in the amended petition are vague and conclusory allegations, insufficient to support an adjudication of dependency. In its petition, HRS alleged that I.T. would be at risk of abuse if left in his parents' care. At the hearing, all the experts agreed that abuse was not a potential problem in the case. HRS also alleged that E.M.T., the microcephalic child, was removed from his parents "for medical neglect." To the contrary, evidence at the hearing showed that the parents voluntarily gave up E.M.T. for adoption, recognizing that they could not manage his special medical needs. There was utterly no evidence that his parents had neglected E.M.T.
HRS further alleged that the mother "was involved in the death of her newborn child." It was error for the trial court to admit evidence concerning the death of the first child. "Similar fact evidence of other crimes, wrongs, or acts ... is inadmissible when the evidence is relevant solely to prove bad character or propensity." § 90.404(2)(a), Fla. Stat. (1985). The testimony could not reasonably be characterized as similar fact evidence because there was no similarity between the tragedy of the first child's conception, birth, and death, and the circumstances of I.T.'s conception and birth. Even assuming, arguendo, a similarity existed between the two events, the evidence was irrelevant as to the issue of prospective neglect and was of no probative value in determining the mother's present ability to care for I.T. The evidence was not even relevant for the improper purpose of showing a propensity for abuse because the experts and the trial court agreed that prospective abuse was not a concern. Finally, the prejudicial effect of the testimony far outweighed any probative value it may have possessed. Referring to the death of the first child, a psychologist remarked at the hearing that "the whole context of the interview, and the evaluation had to do with this  situation, that came about, primarily, because of that aspect of the history." The prejudice ensuing from such evidence is apparent.
It was not error for the trial court to permit discovery of the parents' psychiatric histories. The psychotherapist-patient privilege is, by statute, abrogated in "any situation involving known or suspected child abuse or neglect." § 415.512, Fla. Stat. (1985). We have previously held that the statutory abrogation "by its express language applies to Chapter 39 child neglect proceedings." In the Interest of E.H., 443 So.2d 1083, 1084 (Fla. 3d DCA 1984). E.H. involved a psychiatrist's testimony concerning his examination of the natural mother in the course of a dependency proceeding. Such a proceeding may involve the question of prospective neglect, In the Interest of J.L.P., 416 So.2d 1250 (Fla. 4th DCA 1982), and may implicate psychotherapist-patient communications where, as here, a child has never been placed in a parents' custody or care. Section 415.512 cannot be read so narrowly as to apply only to privileged communications occurring after the birth of a child who is later made the subject of a dependency hearing.
We find, however, that section 415.512 must be read in pari materia with section 39.01(27). A parent's psychiatric history, in and of itself, is not relevant in a dependency proceeding unless the state makes an explicit connection between the parent's past behavior and a potential significant impairment of a child's physical, mental, or emotional health. In our determination that the two statutes must be read together, we are guided by the well-reasoned decisions of the New York courts *1089 in neglect proceedings where a parent's psychiatric history is at issue. Section 1012(f)(i)(A) of the New York Family Court Act mirrors section 39.01(27) and provides in pertinent part:
(f) "Neglected child" means a child less than eighteen years of age
(i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care
(A) in supplying the child with adequate food, clothing, shelter or education in accordance with the provisions of part one of article sixty-five of the education law, or medical, dental, optometrical or surgical care, though financially able to do so or offered financial or other reasonable means to do so....
N.Y.Jud.Law § 1012(f)(i)(A) (McKinney 1981). The neglect petition in In the Matter of Karr, 66 Misc.2d 912, 323 N.Y.S.2d 122 (Fam.Ct. 1971), alleged that the natural father had a history of mental and emotional illness and had previously been hospitalized for the illness. The trial court observed that such a history did not establish neglect per se or unfitness per se and that "[e]ven if it is conceded it is some form of imperfection, it is not unfitness (original emphasis, citation omitted). The imperfection must ripen into unfitness by connecting the actual elements or indicia of neglect stemming from such unfitness under the statute." 323 N.Y.S.2d at 125. The necessity of showing a nexus between a parent's mental illness and prospective significant impairment of a child's health was reaffirmed in In the Matter of Nereida S., 57 N.Y.2d 636, 454 N.Y.S.2d 61, 439 N.E.2d 870 (1982), a decision involving termination of parental rights. The predicate for such an adjudication "is the parent's conduct and relationship with the child, not his or her status per se[.]" 439 N.E.2d at 871, 454 N.Y.S.2d at 62. See also In the Matter of Trina Marie H., 48 N.Y.2d 742, 422 N.Y.S.2d 659, 397 N.E.2d 1327 (1979) (parent's mental illness not a per se basis for finding of neglect); In re Carl A., 81 Misc.2d 354, 366 N.Y.S.2d 269 (Fam.Ct. 1975) (serious doubt whether allegation of mental disturbance, even if unequivocably pleaded, is proper element of neglect); In the Matter of Daniel C., 47 A.D.2d 160, 365 N.Y.S.2d 535 (App.Div. 1975) (where mother did not have care of children for two years prior to finding of neglect, finding rested solely on mental condition; fact that mental illness required hospitalization at intervals did not establish neglect or unfitness per se); In the Matter of Millar, 40 A.D.2d 637, 638, 336 N.Y.S.2d 144, 145 (App.Div. 1972) (Murphy, J., dissenting) (connection must be shown between conduct of parent and impending injury to child), aff'd, 35 N.Y.2d 767, 362 N.Y.S.2d 149, 320 N.E.2d 865 (1974).
Here, the state failed to show a sufficient nexus between the psychiatric histories of the parents and the likelihood that either parent would substantially impair I.T.'s physical, mental, or emotional health. There was no evidence that the parents' mental or emotional problems were likely to cause I.T. to be deprived of necessary food, clothing, shelter, or medical care. Instead, there was speculation that the mother and father might exercise poor judgment under stress.[2] When pressed to give a *1090 specific example of poor judgment, one psychologist suggested that the parents might choose an inappropriate babysitter for I.T. Poor judgment under stress  whether prospective or past  does not rise to the level of statutory neglect and will not support a petition for dependency. See In the Interest of C.S. (mother's overprotectiveness which caused her to react impulsively under stress not sufficient to support finding of dependency based on neglect); In the Interest of G.D.H. (neglect not established by examples of poor parental judgment such as spanking children with belt and forbidding children to take food from refrigerator without permission); In re Interest of C.W., 490 So.2d 175 (Fla. 5th DCA 1986) (neglect not established where through lack of education and experience mother failed to provide baby with formula considered most appropriate by state). Although parental choices and judgments are informally scrutinized by community members such as teachers, police officers, physicians, lawyers, and judges who daily confront the consequences of those choices, the mere fact that parents are not infallible and often err in the course of child rearing does not entitle the state to intervene. For the state to deprive parents of custody of their natural child, something more  indeed according to the statutes a great deal more  is required than a generalized conclusion that the parents lack the requisite "skills" to bring up a child.
I.T.'s parents have acknowledged their need for emotional support and their willingness to accept help. When queried about receiving supervision from the state and assistance from members of the community, the mother responded, "I have no objection. I know, I need help. I appreciate it. [I] [just] want a chance to raise my son." The state concedes that I.T.'s father has voluntarily participated in weekly therapy sessions for two-and-one-half years and has had stable employment for two years. The mother and father belong to a supportive church group, one of whose members lives only a few blocks from the parents. It is uncontradicted that the state does not possess the resources to provide the "intensive daily supervision" deemed necessary by the trial court to minimize the risk of prospective neglect. While we acknowledge the trial court's sincere concern, the reality of inadequate state funding cannot justify removing I.T. from his parent's custody and effectively holding him hostage.[3]
Because the state has failed to show by a preponderance of the evidence that I.T. is at risk of prospective neglect as defined by section 39.01(27), we reverse the order adjudicating I.T. to be a dependent child.
Reversed.
Before SCHWARTZ, C.J., and BARKDULL, HUBBART, BASKIN, DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.

ON MOTION FOR REHEARING GRANTED
PER CURIAM.
Following this court's opinion, the guardian ad litem filed a motion to intervene as party-appellee. The guardian sought additional relief, alleging that it was without notice of the appellate proceedings in this cause. We granted the motion for rehearing, established a briefing schedule, and permitted the guardian to become a party to this appeal. Having duly considered the brief of the guardian, the reply of I.T.'s parents, all motions and the responses thereto, we decline to grant further relief. We have fully considered the points raised *1091 by the guardian, find them to be meritless, and adhere to the panel opinion.

ON SUA SPONTE EN BANC CONSIDERATION
The court as a whole has considered this cause and concludes that rehearing en banc is not warranted.
NOTES
[1] Microcephaly is a congenital defective development of the cerebrum with a thick skull and early closure of the fontanels, resulting in a small head. Blakiston's New Gould Medical Dictionary 743 (2d ed. 1956). The smallness of the cranium prevents proper development of the brain.
[2] The issue of accurate predictions of future dangerousness in a criminal context has been addressed by leading authorities in the fields of psychiatry and psychology. See Barefoot v. Estelle, 463 U.S. 880, 920, 103 S.Ct. 3383, 3408, 77 L.Ed.2d 1090, 1121 (1983) (Blackmun, J., dissenting) (according to American Psychiatric Association, unreliability of psychiatric predictions of long-term future dangerousness is established fact within psychiatric profession); Cross v. Lakeview Center, Inc., 529 So.2d 307 (Fla. 1st DCA 1988) (preeminent psychiatric expert Dr. Park Dietz testified that beyond 24-hour span violence could not be predicted); S. Smith & R. Meyer, Law, Behavior, and Mental Health: Policy and Practice 607-611 (1987) (predictions of dangerousness "not an adequate basis on which to make many legal decisions"); J. Monahan & L. Walker, Social Science in Law: Cases and Materials (1985); J. Monahan, The Clinical Prediction of Violent Behavior (1981); Morse, Crazy Behavior, Morals, and Science: An Analysis of Mental Health Law, 51 S.Cal.L. Rev. 527, 600 (1978) (when predicting violence, dangerousness, and suicide, mental health professionals are "far more likely to be wrong than right"); APA Task Force Report, Clinical Aspects of the Violent Individual 28 (1974) (90% error rate in predictability is "state of the art"); Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif.L.Rev. 693 (1974). If psychiatric predictions of future dangerousness may be inaccurate far more often than not, it scarcely requires a quantum leap in reasoning to conclude that mental health professionals may not be able to accurately predict prospective neglect in a dependency setting.
[3] The trial court observed:

I am not going to consider placing this child back at home, unless, and until I am assured that somebody, perfectly responsible  you know  somebody not likely  highly unlikely to break down, at any point, in a moment of stress  will be there looking at this situation on a kind of a daily basis.