797 So.2d 1261 (2001)
B.D., Mother of M.D., A Child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 1D00-4229.
District Court of Appeal of Florida, First District.
October 26, 2001.
Joan M. Wood, Northwest Florida Legal Services, Inc., Pensacola, for Appellant.
Paul Flounlacker, Assistant District Legal Counsel, Pensacola, for Appellee.
BROWNING, J.
B.D. (Appellant), the mother of a 3-½-year old daughter, M.D., appeals the trial court's order adjudicating the child dependent. Appellant contends that the appellee, Department of Children & Families (Department), failed to show a sufficient nexus between Appellant's mental-health problems and the danger of significant impairment of the child's physical, mental, or emotional health. § 39.01(2),(14)(a), (14)(f), & (46), Fla. Stat. (1999); E.M.A. v. Department of Children & Families, 795 So.2d 183 (Fla. 1st DCA 2001) (revised opinion); Richmond v. Department of Health & Rehabilitative Services, 658 So.2d 176 (Fla. 5th DCA 1995). Because the trial judge did not have the benefit of our recent decision in E.M.A., and made several oral comments on the record that *1262 appear to conflict with the court's eventual finding of dependency, we reverse the order and remand for additional findings to clarify the basis for the adjudication of dependency.
Under Florida law, a "[c]hild who is found to be dependent" includes, inter alia, one who has been "abandoned, abused, or neglected" by the parent(s) or legal custodian(s), or a child who is found "[t]o be at substantial risk of imminent abuse, abandonment, or neglect" by the parent(s) or legal custodian(s). § 39.01(14)(a) & (f), Fla. Stat. (1999). "Proof of abuse, neglect, or abandonment sufficient to demonstrate a state of dependency must be shown by a preponderance of the evidence." E.M.A., 795 So.2d at 185; § 39.507(1)(b), Fla. Stat. (1999). Even in the absence of actual prior abuse, abandonment, or neglect, a finding of dependency can be made if the "imminence" requirement is satisfied. Id.; D.D. v. Department of Children & Families, 773 So.2d 615 (Fla. 5th DCA 2000); Denson v. Department of Health & Rehabilitative Services, 661 So.2d 934 (Fla. 5th DCA 1995); Richmond, 658 So.2d at 176.
Department based its case primarily on the proposition that Appellant's mental illness places the child at risk of prospective "neglect." § 39.01(46), Fla. Stat. (1999). An adjudicatory hearing was held in mid-July 2000 in accordance with section 39.507, Florida Statutes (1999). A psychiatrist, Dr. Samanta, was deemed an expert witness and testified that she had first treated Appellant in mid-November 1999 in the course of an involuntary "Baker Act" commitment at Baptist Hospital. The doctor saw her every day until Appellant's discharge two weeks later. Based on observation and assessment, the diagnosis was "psychotic disorder NOS, not others specified." Dr. Samanta based this diagnosis on findings that Appellant was paranoid, very delusional, suspicious, guarded, and unstable in mood. Appellant had refused to cooperate with admissions procedures, including the providing of requested information, the signing of documentation, and the giving of consent to treatment. Contending that other family members were lying about her acts and were the ones who really needed mental-health treatment, Appellant had minimized the severity of her own mental problems and had denied needing treatment or medications. During another commitment in mid-March 2000, Appellant was more hostile, delusional, and paranoid, and she was more aggressive toward her parents and brother than before. Appellant was physically aggressive and getting worse. Her diagnosis was unchanged.
The doctor opined that if a person suffering from a mental illness like Appellant's is not adequately treated with medication, counseling, and supervision, the condition will gradually worsen and, eventually, will reach the point where the individual is a danger to herself through self-neglect. Given this scenario, the doctor was "specially concerned" about Appellant's child. Dr. Samanta opined that although Appellant had not yet presented an immediate danger to herself and others, there was a potential that she would pose a risk to herself. Citing Appellant's "negligence" and failure to grasp reality, the doctor opined that Appellant "showed poor judgment in taking care of herself and also put[ ] herself in danger, especially her child in danger." Although the doctor did not think Appellant would intentionally harm the child, she questioned whether Appellant has a sufficient understanding of reality and the principles of child-rearing to take proper care of the young child, who was barely 2 years old at the time of the adjudicatory hearing. Dr. Samanta expressed concern about Appellant's safety *1263 and noted that if Appellant did not take care of herself and did not receive proper treatment, the child's safety and well-being would be adversely affected. According to the doctor, Appellant continued to be uncooperative with efforts to treat her, and she stubbornly refused to take prescribed medications for her mental illness. Such behavior, in the doctor's view, will result in the progressive worsening of Appellant's psychotic state.
In its petition for dependency, Department alleged that Appellant had exhibited certain "bizarre behavior" and had condoned some specific activities that placed the child in immediate danger. See Hardy v. Department of Health & Rehabilitative Services, 568 So.2d 1314 (Fla. 5th DCA 1990) (statutory definition of "neglect" includes circumstances where parent permits child to live in environment in which child's physical health is in danger of significant impairment). Appellant's brother testified that she sometimes was inattentive when the child was present. Appellant had acted as if the child's "scrunching" plastic bags (large enough to enclose her body) was perfectly fine, and he had discussed his safety concerns with Appellant, who seemed not to care. The witness testified that he had observed the child open a utensils drawer in the kitchen and remove a steak knife while Appellant was "watching her." He was concerned because Appellant kept the child in a fabric shoulder harness or on a child leash but was so inattentive that she did nothing when the child ran into doors and walls and lost her balance. The witness testified that he had observed Appellant brushing the child's teeth with excessive force, causing the child to scream on several occasions during brushing. Appellant's parents testified that it was "a regular thing" for the child to experience discomfort from Appellant's manner of brushing the teeth. The brother expressed concern that Appellant seemed not to notice that the child sometimes would cry out when her limbs were bent too far during clothes-changing.
Appellant's brother described her as often extremely paranoid, suspecting someone was "out to do her in" or harm her. According to him, Appellant seemed to feel that her family had been brainwashed by someone with unlimited resources who was dedicated to ruining her life. Appellant wore ear plugs 24 hours a day to avoid being "brainwashed" through the air waves, e.g., from satellite or cable television. Appellant told her brother about an imaginary friend inside her head who is telepathic and tells her what people are about to say or do. Appellant sometimes converses with her imaginary friend and is subject to prolonged, convulsive bursts of laughter. The witness testified that Appellant believes that some people use circles and red objects to hypnotize others. For that reason, Appellant uses towels to cover up red objects as well as circular objects in the house such as fans or stools.
Appellant's father testified that Appellant had lived with her parents for her entire life until 1-2 months before the hearing, when she and the child moved first to a tent in a campground and then elsewhere. Characterizing Appellant as "a complete slob" when feeding the child, Appellant's father testified that he had committed her out of concern for her worsening mental state and personal habits. He had heard Appellant in the garage laughing in 20-40 second cycles that would continue for hours like someone "who had completely lost it." Appellant had informed her father that someone was controlling them through the satellite receiver.
Appellant characterized her relatives' testimony as false or inaccurate. She explained that her comments about the satellite *1264 dish merely referred to her worries that her parents watch too much television. She admitted that the child had removed a plastic jelly knife from a drawer, but she asserted that the steak knives were out of reach. She said the child is kept in a harness to protect her from bumps and bruises. Appellant characterized her physicians as "unprofessional" and prone to give inaccurate medical opinions. She described her involuntary commitments as wasted time that she could have spent at home with her child. Admitting that she had not tried to get an independent psychiatric examination to refute Dr. Samanta's findings, Appellant opined: "I have no mental problem. I mean, it's not a matter of belief, I have no mental problem." Given her steadfast belief that the diagnosis of mental illness is inaccurate, Appellant expressed her unwillingness to put "unneeded chemicals," including prescribed medications, in her body.
In sum, it is undisputed that despite repeated involuntary commitments and medical diagnoses of serious mental-health problems, Appellant has consistently refused to acknowledge her illness and has resolutely refused to comply with standard medical procedures for gathering essential information and for taking prescribed medications. The medical testimony clearly establishes that the likely result of this willful pattern of non-compliance is the progressive worsening of Appellant's mental-health disorder, with the attendant dangers to herself and to her 3-½-year-old child.
In another recent dependency case, E.M.A., 795 So.2d at 185, we dealt with a mentally ill parent's different types of willful acts and omissions that, like Appellant's, made it considerably more likely that the dangerous manifestations would occur more frequently and severely and would last longer, to the detriment of the parent and the very young children. Under those circumstances, we concluded that "the legislature did not intend for trial judges to wait helplessly until the next episode occurs and the children are neglected or abused." Id. at 188.
At the conclusion of the adjudicatory hearing, the trial court found the child dependent, based principally on Dr. Samanta's unrefuted medical opinion that Appellant lacks a sufficient grasp of reality to be a safe parent. Mindful of our conclusions in E.M.A., we likewise believe that Department presented competent substantial evidence that, if accepted by the trial court, would establish the requisite nexus between Appellant's mental illness and the substantial prospect of imminent harm to the child. Richmond, 658 So.2d at 176. Therefore, we concur with the trial court's finding that Appellant abused or neglected, or threatened to abuse or neglect, the child.
We remand for clarification, however, in light of the trial judge's verbal remarks at the end of the adjudicatory hearing indicating that the evidence of Appellant's mental illness is "not clearly connected" to her child-rearing capacities. Absent a sufficient nexus between a psychiatric disorder and the likelihood that a parent will substantially impair the child(ren)'s physical, mental, or emotional health, neither of the pertinent subsections of section 39.01(14), Florida Statutes (1999), has been satisfied, and an adjudication of dependency cannot stand. E.M.A.; I.T. v. Department of Health & Rehabilitative Services, 532 So.2d 1085 (Fla. 3d DCA 1988). The trial court characterized the evidence of dependency as "marginal." If the matters at issue were purely a question of law, over which we have de novo review, we would affirm the dependency order outright. However, in this case, the issues of the nature and *1265 extent of Appellant's mental condition, and the connection between her illness and her child-rearing abilities, are inextricably tied to questions of fact that lie within the initial ambit of the trial court. E.R., 773 So.2d at 617 (stating an adjudication of dependency will be upheld if supported by competent substance evidence); Interest of D.J.W., 764 So.2d 825 (Fla. 2d DCA 2000). Given our recent pronouncement in E.M.A. and the inconsistent verbal and written findings rendered by the trial court in the initial proceedings, we deem it necessary to reverse the order and remand for further findings clearly stating whether Department met its burden, by a preponderance of the evidence, to satisfy at least one of the statutory grounds for dependency. The trial court may, if needed, receive additional evidence on these questions.
The dependency order is REVERSED, and the case is REMANDED, for further findings and clarification.
BOOTH and BENTON, JJ., concur.