SHEPHERD, J.,
dissenting.
I respectfully dissent.
The majority concludes that anytime a parent sells drugs in the vicinity of his offspring, the right to remove the offspring attaches a fortiori. I am unwilling to license such an unbridled assertion of government power. While Chapter 39 of the Florida Statutes is designed to allow the state to intervene in homes with “bad parents,” the statute establishes a careful balance between government interference and the primacy of the family in our social structure. Absolutes are not favored. See In re M.F. v. Fla. Dep’t of Children & Families, 770 So.2d 1189 (Fla.2000). To the contrary, the not-to-be-forgotten purpose of Chapter 39 of the Florida Statutes administered by the Department of Children and Families (DCF) is to “preserve and strengthen the child’s family ties.” § 39.001(l)(f), Fla. Stat. (2005). It is our duty to preserve the balance.
The trial court in this case adjudicated D.C. and L.C. dependent as to the father, J.C., on the ground they were “under substantial risk of imminent threat of harm or abuse and neglect” within the meaning of § 39.01(14)(f), Fla. Stat. (2005). However, there is no evidence in the record that 1) J.C. kept drugs in the home; 2) exposed the children to drugs; or 3) the children were aware of the father’s activities in the detached structure behind the home. DCF did not “get wind” of J.C.’s criminal activity until after he was arrested. Although the mother did not participate in the father’s misdeeds, the state removed *188 the children from both parents and adjudicated the children dependent as to both.
I do not condone the father’s activities. On a visceral or emotional level, one can understand DCF’s actions. But DCF, like all other litigants, must prove its case, especially where such a vital matter — the parent-child bond — is at stake. I do not believe it did so here.
FACTS
The record in this case is sparse. Read most favorably to DCF, it reflects that on January 18, 2005, City of North Miami Beach Detective David Streeter initiated surveillance of J.C.’s property. Streeter testified he observed “subjects driving up to the residence going to the rear and side of the residence, going to the detached structure in the back that appeared to be an efficiency [apartment] ... and what appeared to be hand-to-hand drug transactions outside.” (Emphasis added). Over the next three days, Street-er arranged three buys to confirm the accuracy of his observations. All three drug transactions took place inside the detached structure. Notably, Streeter did not testify that any of the subjects went inside the residence. Streeter did not see the children at any time. Shortly after the third purchase occurred on January 21, 2005, J.C. was arrested and taken into custody.
Thereafter, on January 24, 2005, DCF received an abuse report, presumably from the police department. Lead Child Protective Investigator, David Okon, and a colleague, Apolla Bustamante, reported to the family home and spoke with the mother outside the presence of the children. Although she knew what the father had been doing behind the home, she did not participate. When asked if the children “appeared abused or neglected in any way,” Okon replied, “No.”[3] Okon did not remove the children at that time. Rather, he returned to his office to “do paperwork” and discuss the matter with his boss. The next, day, January 25, 2005, without further investigation, Okon returned to the home and removed the children.
On January 31, 2005, after the children were removed from the home, the police executed a search warrant on the premises. A gun was found in a sock in a drawer in one of the bedrooms of the home.[4] Based on testimony of Okon, Bustamante, and Streeter, the trial court adjudicated the children dependent as to both parents.
The Adjudicatory Order
The trial court held a joint adjudicatory trial on the Dependent Petition as against both parents. The crux of the trial court’s reasoning for adjudicating the children dependent as to the father was its finding that “the Father sold drugs while the children were in his care, the children were exposed to drugs and drug related activities and the Father maintained an unsecured firearm while the children were in *189 his care.” The adjudication as to the mother was based upon her “fail[ure] to protect the children from an inadequate caretaker.”
Dependency Adjudications
The Florida Legislature has explained that a prime purpose of the Florida Juvenile Justice Act (the “Act”), Chapter 39 of the Florida Statutes, is to guarantee to each child in Florida safe and supportive home environment:
39.001 Purposes and intent ...
(1) PURPOSES OF CHAPTER. — The purposes of this chapter are:
(a) To provide for the care, safety, and protection of children in an environment that fosters healthy social, emotional, intellectual, and physical development; to ensure secure and safe custody; and to promote the health and well-being of all children under the state’s care.
§ 39.001(l)(a), Fla. Stat. (2005). Coextensive with this purpose is a second equally important goal: preservation of the family. Section 39.001(l)(f), Florida Statutes (2005) reads:
(1) PURPOSES OF CHAPTER. — The purposes of this chapter are:
(f) To preserve and strengthen the child’s family ties whenever possible, removing the child from parental custody only when his or her welfare cannot be adequately safeguarded without such removal.
§ 39.001(l)(f), Fla. Stat. (2005). Thus, an adjudication proceeding “is not merely an inquiry ... as to what may be in the best interest of the child. It is an interference with the fundamental right of [ ] parent[s] to raise their children.” A.M.T. v. State, 883 So.2d 302, 306 (Fla. 1st DCA 2004)(in-ternal citations omitted). Parents’ fundamental liberty interest in determining the care and upbringing of their children “does not evaporate simply because they have not been model parents.” Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); O.C. v. Dep’t of Children & Family Servs., 934 So.2d 623, 628 (Fla.2d DCA 2006). Accordingly, to support an adjudication of dependency in this state, the parent’s harmful behavior must be a present threat to the child. See B.C. v. Dep’t of Children & Families, 846 So.2d 1273 (Fla. 4th DCA 2003).
Under the Florida Juvenile Justice Act, a “[cjhild who is found to be dependent” includes one who has been “abandoned, abused or neglected by the child’s parent[s]”, or a child who is found “[t]o be at substantial risk of imminent abuse, abandonment, or neglect by the parent[s].” § 39.01(14)(a), (f), Fla. Stat. (2005)(em-phasis added). Therefore, “before we can affirm the trial court’s adjudication of dependency, we must find: competent, substantial evidence that the child was abandoned; competent, substantial evidence that the child was abused; competent, substantial evidence that the child was neglected; or the risk of abandonment, abuse or neglect is imminent.” J.B.M. v. Dep’t of Children & Families, 870 So.2d 946, 949 (Fla. 1st DCA 2004). I address each possibility in turn.
Abandonment
An abandoned child is one whose parent or caregiver “while being able, makes no provision for the child’s support and makes no effort to communicate with the child....” §39.01(1), Fla. Stat. (2005). While the Dependent Petition alleges abandonment, there was no allegation or evidence of abandonment introduced or argued during trial. Consequently, there can be no finding of dependency based upon abandonment, and we cannot affirm the trial court on this ground. See J.B.M., 870 So.2d at 950.
*190 Abuse
The second ground by which a child may be found dependent is abuse. An abused child is one who is subjected to “any willful act or threatened act that results in any physical, mental, or sexual injury or harm that causes or is likely to cause the child’s physical, mental, or emotional health to be significantly impaired.” § 39.01(2), Fla. Stat. (2005)(emphasis added). “Abuse of a child includes acts or omissions.” Id. For the children to be adjudicated dependent under this statute, DCF must prove: (1) a “willful” or “threatened” act; (2) the act must “result[ ]” in “injury” or “harm”; and (3) that “injury” or “harm” must either:
(a) “cause[ ] ... the child’s physical, mental or emotional health to be significantly impaired;” or
(b) [be] likely to cause the child’s physical or emotional health to be significantly impaired.
“Physical injury,” “mental injury,” and “harm” are further defined. “ ‘Physical injury’ means death, permanent or temporary disfigurement, or impairment of any bodily part.” § 39.01(52), Fla. Stat. (2005). “‘Mental injury’ means an injury to the intellectual or psychological capacity of a child as evidenced by a discernible and substantial impairment in the ability to function within the normal range of performance and behavior.” § 39.01(43), Fla. Stat. (2005). “Harm” is defined to include all manner of actual physical, mental, and emotional harm or exposing a child to such substances (1) when a mother’s use of a controlled substance during her pregnancy demonstrably adversely affects the child; or (2) where a parent engages in “[c]ontin-ued chronic and severe use of a controlled substance [and] the child is demonstrably adversely affected by such usage.” § 39.01(30)(g), Fla. Stat. (2005). A plain reading of this section of Chapter 39 makes it clear that it is intended to reach cases of actual abuse. T.S. v. Fla. Dep’t of Children & Families, 935 So.2d 626 (Fla. 1st DCA 2006)(noting that a child may be found dependent if the child has been “abandoned, abused, or neglected by the child’s parentfs]” or is in “substantial risk of imminent abuse, abandonment, or neglect by the parent[s]”); J.B.M., 870 So.2d at 951 (“if there is no evidence the child actually suffered harm or injury— physical, mental or emotional — as a consequence of a parent’s alcohol or drug use, evidence that the parent has a drug or alcohol problem, standing alone, is insufficient to support a finding of dependency”)(emphasis added); E.M.A. v. Dep’t of Children & Families, 795 So.2d 183, 185 (Fla. 1st DCA 2001)(applying the imminence requirement of section 39.01(14)(f) of the Florida Statutes in the absence of proof of actual abuse, abandonment, or neglect). That this section of the Act is intended to cover instances of actual abuse is further confirmed by the last sentence which excludes corporal punishment from its reach unless it “result[s] in” harm to the child. § 39.01(2), Fla. Stat. (2005)(em-phasis added).
As confirmed by the testimony of Investigator Okon at trial, the children in this case had not been subject to any actual abuse by either parent. There is no ground for a finding of actual abuse of these children under the Florida Juvenile Justice Act.
Neglect
The final ground we may consider in a dependency action is whether there is competent, substantial evidence the child was neglected. Under section 39.01(45), Florida Statutes (2005),
“Neglect” occurs when a child is deprived of, or is allowed to be deprived of, necessary food, clothing, shelter, or medical treatment ... or is permitted *191 to live in an environment when such deprivation or environment causes the child’s physical, mental, or emotional health to be significantly impaired or to be in danger of being significantly impaired.
§ 39.01(45), Fla. Stat. (2005)(emphasis added).
As recognized by the majority, there is “absolutely no evidence that the children were deprived of necessary food, clothing, shelter, or medical treatment.” See supra majority p. 186. Furthermore, as stated by the majority, “there is no evidence that the children were present or even aware that their father was selling drugs.” Id. at p. 187. Thus, there again is no evidence the children have been at any time the subject of any actual physical, mental, or emotional neglect. Nevertheless, the majority suggests an adjudication is appropriate in this case because the environment in which the children found themselves was likely to cause substantial impairment to their “physical, mental and/or emotional health.” Id. To the extent that either DCF or the majority wishes to suggest the adjudication in this case was appropriate based upon a “danger” that the physical, mental, or emotional health of the children would be “significantly impaired” in the future, the evidence still must meet the imminen-cy requirement of section 39.01(14)(f). See B.C., 846 So.2d at 1274; see also In re: J.L. v. Dep’t of Children & Family Servs., 824 So.2d 1023, 1025 (Fla. 2d DCA 2002)(“[w]hile prospective neglect or abuse can be a basis for an adjudication of dependency, the Department must meet the statute’s imminency requirement”); E.M.A., 795 So.2d at 185 (“The statutory definitions of ‘abuse’ and ‘neglect’ do not expressly include [a] requirement of imminence. However, when [absent actual abuse, abandonment or neglect] these definitions are read in pari materia with the related language in section 39.01(14)(f), a risk of imminent neglect seems to be required to establish that a child is ‘dependent’ as a matter of law.”)(internal citations omitted).
There is no ground in this case for a finding of actual neglect of the children. As demonstrated next, neither did the evidence adduced at trial support an adjudication under section 39.01(14)(f) of the Florida Statutes.
Imminency
In the absence of actual abuse, abandonment, or neglect, a finding of dependency can still be made if a child is found by the court “[t]o be at substantial risk of imminent abuse, abandonment, or neglect by the parent or parents or legal custodians.” § 39.01(14)(f), Fla. Stat. (2005). While all imminent abuse or neglect is prospective in nature, all prospective abuse is not imminent within the meaning of the statute. Thus, in all imminency eases the issue is whether “future behavior will adversely affect the child and can be clearly and certainly predicted.” In re P.S. v. Dep’t of Children & Family Servs., 825 So.2d 530, 531 (Fla. 2d DCA 2002); Palmer v. Dep’t of Health & Rehab. Servs., 547 So.2d 981, 984 (Fla. 5th DCA 1989); see also Nicholson v. Scoppetta, 3 N.Y.3d 357, 787 N.Y.S.2d 196, 820 N.E.2d 840, 845 (2004)(“Imminent danger ... must be near or impending, not merely possible.”).
In this case, any arguable danger to the children was removed by the North Miami Beach Police Department at the time of J.C.’s arrest. DCF presented no evidence at trial concerning whether, post-arrest, there remained any “impending,” “possible,” or even probable danger to J.C.’s children. See J.C. v. Dep’t of Children & Families, 773 So.2d 1220, 1222 (Fla. 4th DCA 2000)(a possibility of future harm “[does] not rise to the level of injury ... likely to cause the child’s physical, mental, *192 or emotional health to be significantly impaired”). Nevertheless, placing its primary reliance in both its brief and at oral argument on D.D. v. Dep’t of Children & Families, 773 So.2d 615, 618 (Fla. 5th DCA 2000), DCF argues the adjudication in this case should be affirmed. This reliance is misplaced.
In D.D., DCF presented multiple witnesses concerning incidents of. verbal and physical abuse perpetuated by a father upon the mother in the presence of E.R., the couple’s minor child. E.R. was adjudicated dependent as to the father, and the father appealed. Based upon the trial court’s conclusion that the child had witnessed her father’s abuse against her mother when the parties were a couple, and that the mother and father were more likely than not to continue their relationship in the future, the court adjudicated E.R. dependent as to the father. The Fifth District Court of Appeal affirmed:
The evidence of the father’s abuse of the mother as witnessed by the child, together with evidence indicating that the parents will more likely than not resume their relationship in the future and thus resume their cycle of domestic violence in the presence of the child, establishes prospective neglect sufficient to support a finding of dependency, even in the absence of medical or other expert testimony.
Id. (emphasis added). Unlike D.D., however, there is no record evidence here concerning whether or not J.C. was likely, post-arrest, to engage in any unlawful activity, let alone in the vicinity of the children. The state agencies that needed to protect these children were the police department and the office of the state attorney. They did their job. Moreover, “[i]n cases like this one, where the record discloses no prior act of [actual] neglect or abuse, the Florida Legislature apparently has concluded that the mere possibility of future abuse, neglect, or abandonment will not support a finding of dependency.” R.S. v. Dep’t of Children & Families, 881 So.2d 1130, 1133 (Fla. 4th DCA 2004).
Finally, I find it instructive that our supreme court very recently rejected a per se rule of the type today adopted by the majority in the equally if not more troublesome context of child sexual abuse in the home. In In re M.F., 770 So.2d at 1189, rebuffing authority from this district and the Second District Court of Appeal, the supreme court disapproved an adjudication of dependency of a father, R.F., as to two biological children with whom he had lived in the same structure based solely upon a recent conviction for attempted sexual battery on his stepdaughter. “A simple showing that a parent committed a sex act on one child does not by itself constitute proof that the parent poses a substantial risk of imminent abuse or neglect to the child’s sibling....” Id. at 1194. Our case involves the undisputed criminal act of the sale of drugs outside a home. If a conviction for sexual misconduct occurring in the home is insufficient without more to meet the statutory imminence requirement as to children living with the offending party in the same home, I am hard-pressed to find that the sale of drugs outside the home, standing alone as in this case, would support an adjudication as the majority opines. As Justice Pariente cautions in her special concurrence in In re M.F., per se rules can all too quickly implicate “due process concerns” in the sensitive area of fundamental parental rights, id. at 1196, especially where “our Legislature has not [seen fit to] specifically provide[ ] a per se rule” that selling drugs in the vicinity of children constitutes grounds for an adjudication of dependency. Id. Cf. § 39.806(l)(f), Fla. Stat. (2005)(providing that grounds for termination of parental rights exist when the parent engages in *193 egregious conduct that threatens the life of the child’s sibling or results in the sibling’s serious bodily injury or death).
I do not believe DCF met the imminen-cy requirement in this case.
Conclusion
“Parents have a fundamental liberty interest in determining the care and upbringing of their children ‘free from the heavy hand of government paternalism.’ ” O.C., 934 So.2d at 623 (internal citations omitted). “This liberty interest ‘does not evaporate simply because they have not been model parents.’ ” Id. “The State of Florida does not demand perfection from its families.” T.G. v. Dep’t of Children & Families, 927 So.2d 104, 107 (Fla. 1st DCA 2006)(internal citations omitted). “[Rather], the State demands that children be protected from abuse and from the substantial risk of imminent abuse.” Id.
Upon discovery of J.C.’s illegal activities, there was aggressive criminal justice intervention. J.C. was taken into custody. But in our society, one whose liberty is restrained for the commission of a criminal act does not lose all of his other liberties. Among those, he does not lose his liberty interest in his children and their upbringing unless another agency of the state, DCF, can prove under another set of laws that the children have been abused or are at a substantial risk of imminent abuse, abandonment, or neglect.
However tempting it might be to affirm this case, either as additional punishment of J.C. or because he was not using best practices as a parent, the laws of this state do not permit either. See T.G., 927 So.2d at 107; In re M.F., 770 So.2d at 1193. (“The purpose of a dependency proceeding is not to punish the offending parent.”). Rather, child dependency laws of this state focus on the “care, safety, and protection” of the child. § 39.001(l)(a). They provide the exclusive means whereby a court can declare a child to be dependent. I.T. v. Dep’t of Health Rehabilitative Servs., 532 So.2d 1085, 1087 (Fla. 3d DCA 1988). Applying these laws to the facts of this case, I conclude that because DCF failed to offer sufficient proof at trial either that the children had suffered any actual harm or were at substantial risk of imminent abandonment, abuse, or neglect under the dependency laws of this state, we are compelled to reverse.
I would reverse the adjudication of dependency below.

. Bustamante confirmed that "[ajpparently [the children] weren't aware of what was going on....” According to Bustamante, the mother "made it seem like [J.C.'s drug selling] was not putting the children at risk because it was being done outside of where they were residing, at the back.” Bustamante was not involved in the decision to remove the children from the home.

. The majority opinion emphasizes the discovery of the gun. However, given the fact DCF’s intervention commenced before the execution of the search warrant, it is clear the existence of the gun had nothing to do with whether DCF considered its intervention legally authorized or necessary. Moreover, the existence of a gun in a sock in a house, without more — e.g., some proof of prospective harm, — is legally insufficient to support a dependency adjudication. See infra pp. 191-93.